The RIGGS NATIONAL BANK
OF WASHINGTON, D.C.

v.

Edward R. WEBSTER, et al.

Civ. No. JFM–93–309.

United States District Court,
D. Maryland.

Aug. 13, 1993.

148

Deborah Brand Baum, David G. Fiske, Thomas W. Mitchell, Shaw, Pittman, Potts & Trowbridge, Washington, DC, for plaintiff.

Roger C. Simmons, Susan G. Eisner, Gordon and Simmons, Frederick, MD, for defendants.

## MEMORANDUM

MOTZ, District Judge.

The Riggs National Bank of Washington, D.C. has sued Edward and Margaret Webster for repayment of a multi-million dollar loan. The Websters have filed counterclaims against Riggs for alleged violations of the Equal Credit Opportunity Act ("ECOA"), breach of contract, breach of an implied contract, negligent misrepresentation and fraud.[1]

Riggs has filed a motion to dismiss the ECOA and contract claims and has filed a motion for summary judgment as to the fraud and negligent misrepresentation claims. The Websters have responded to the motions and have themselves moved to file an amended counterclaim, asserting, *inter*

---

1. The Websters originally asserted an independent claim for attorneys' fees but they have withdrawn that claim.

*alia,* a new claim for tortious interference with contract.[2]

## I.

Until the dispute which gave rise to this law suit occurred, Edward Webster had been a customer of Riggs for approximately thirty-five years.[3] In February 1987, Riggs agreed to lend the Websters up to $9,300,000 for the purpose of refinancing and renovating an office building located at 33 N Street, N.E., in the District of Columbia. The property was owned by Mrs. Webster. The original maturity date of the loan was August 31, 1988, and the interest rate was set at 1½% in excess of "that rate announced from time to time by ... [Riggs] as its Prime Rate of interest." The amount of which Riggs was actually called upon to loan turned out to be approximately $6,000,000.

The loan was extended retroactively on three occasions. The third extension was memorialized in a "Third Amendment To Consolidation And Modification Of Promissory Notes Agreement." This amendment extended the maturity date to September 30, 1992 and provided that the Websters could obtain another extension upon prepaying $1,000,000 of the principal.

On February 24, 1992, two Riggs officials, Casey Brill and Hugh Rial, met with William Gerrish, the Websters' son-in-law and business manager. Rial suggested terms of an agreement whereby, *inter alia,* the Websters would be given a lower interest rate (one which was either fixed or a floating rate set at 1% or 2% above the Wall Street Journal Prime) and a three to five year extension of the maturity date in exchange for putting up additional collateral, specifically a second office building located at 50 Patterson Street. On March 2, 1992, Rial wrote a letter to Mr. Webster confirming that Riggs was "prepared to consider an extension of the 33 N Street loan with the following general terms:

A) Term—3 years

B) Interest Rate—Floating at 1.5% above the Prime Rate as quoted by the Wall Street Journal

C) Extension Fee—½%

D) Additional Collateral—First Trust on 50 Patterson Street sufficient to reduce the Loan-to-Value Ratio on 33 N Street to 80%."

The letter indicated that certain information, including an appraisal on 50 Patterson Street, would "be required prior to presenting this request to the appropriate committee." Further, the letter stated that "only Special Assets Committee can approve the terms of this extension. In no way are the terms discussed in this letter intended to be a loan commitment."

The Websters compiled the information requested of them in the March 2nd letter and, according to them, provided it to Riggs by July 15, 1992. Difficulties, however, developed. In February, 1992 Riggs had an appraisal of 33 N Street showing a fair market

---

**2.** There are also pending a number of discovery motions. I find that all but one of the Websters' claims are deficient for reasons which could not be cured by further discovery, and I will therefore deny most of the motions as moot. I will, however, grant the Websters' motion to lift the stay on discovery as to their contract involving the Riggs Prime Rate issue. Likewise, I will direct the parties to confer with one another further on the Websters' motion to compel to the extent that it relates to that issue.

**3.** In stating the facts that are material to Riggs' motion to dismiss, I have, of course, assumed that the allegations made by the Websters in their counterclaim are true. Likewise, in stating the facts material to Riggs' motion for summary judgment I have stated the facts as viewed in the light most favorable to the Websters. This does not mean, however, that I have stated all of the myriad of subsidiary facts which the Websters assert demonstrate Riggs' bad faith in its dealings with them. At least in cases such as this, there is no statutory or common law action merely for "acting in bad faith," *see, e.g., Howard Oaks, Inc. v. Maryland Nat'l Bank,* 810 F.Supp. 674, 677 (D.Md.1993); *Parker v. Columbia Bank,* 91 Md.App. 346, 366, 604 A.2d 521, 531 (1992); *Republic Ins. Co. v. Bd. of County Comm'rs.,* 68 Md.App. 428, 432, 511 A.2d 1136, 1138 (1986), and the Websters have not attempted to assert such a claim. Thus, it may be assumed (as may be true) that Riggs treated a long-standing customer quite shabbily and pursued its short term interests with unseemly aggressiveness. While these facts might color the record, unless Riggs committed a breach of its statutory or common law duties toward the Websters, the purity of its intentions and the propriety of its conduct are not material.

value of $5,000,000. Riggs ordered a new appraisal which indicated that the fair market value of the property was only $4,000,000. Riggs also received a draft of an appraisal of the 50 Patterson Street property which reflected a fair market value of $2.9 million. These appraisals were problematical because they indicated that even with the placement of 50 Patterson Street as additional collateral, the 80% loan-to-value ratio required by Riggs (as stated in the March 2nd letter) would not be achieved.

The Websters assert that the appraisal for the 33 N Street property was unreasonably low and that Riggs knew that it was unreasonably low. In addition, they assert that Riggs decreased the appraisal of 50 Patterson Street. Nevertheless, it is undisputed that Riggs' Special Assets Committee never approved the extension of the Websters' loan, and that prior to the expiration of the September 30, 1992 maturity date, Riggs advised the Websters that the loan would not be extended.

## II.

The Websters assert two claims under the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.*: (1) that Riggs failed to notify them of its disapproval of their extension request in violation of 15 U.S.C. § 1691(d)(1) within thirty days of their submission of a completed application for the extension; and (2) that in requiring Mrs. Webster to sign the promissory note on the loan, Riggs discriminated against Mr. Webster on account of his marital status in violation of 15 U.S.C. § 1691(a)(1).

## A.

■ Under the regulations implementing ECOA, a creditor must notify an applicant for credit of adverse action on the credit request within thirty days of the submission of a completed application. 15 U.S.C. § 1691(d)(1); 12 C.F.R. § 202.9(a)(1)(i). Contending that they submitted a completed application at the latest by July 15, 1992, the Websters assert that Riggs violated this notice provision by not advising them of the denial of their extension request on or before August 15, 1993. Assuming that the Websters did submit all of the information requested of them by July 15th, this alone did not trigger the running of the thirty day notification period. An application is not "complete" until the "creditor has received all the information it regularly obtains and considers in evaluating applications", *see* 12 C.F.R. § 202.2(f); *High v. McLean Fin. Corp.,* 659 F.Supp. 1561, 1564 (D.D.C.1987), and it is undisputed that Riggs did not receive even drafts of the appraisals that it had ordered until mid-August. By that time, according to the Websters, Riggs had made counteroffers which (by necessary implication) constituted denial of the Websters' extension request on the terms which they had offered.

■ In any event, Riggs had no duty to notify the Websters of its disapproval of their request. "[T]he term 'adverse action' ... does not include a refusal to extend additional credit under an existing credit arrangement ... where such additional credit would exceed a previously established credit limit." 15 U.S.C. § 1691(d)(6). The term "credit" includes "the right granted ... to an applicant to defer payment of a debt." 12 C.F.R. § 202.2(j). Thus, by requesting an extension of the maturity date on their promissory note, the Websters were seeking additional credit that would "exceed a previously established credit limit."[4] Moreover, even if that were not so, under the third amendment to the note the Websters could obtain another extension only by prepaying $1,000,000 of

---

4. The Websters argue that it is overly technical to construe the phrase "previously established credit limit" in this manner and that the language should be interpreted in accordance with its ordinary meaning in the banking industry as referring to a monetary credit limit. It is ironic that the Websters should make such a contention since their ECOA claims themselves are highly technical. If common sense and the concept of "ordinary meaning" were governing, ECOA and its regulations would never be applied to an ongoing process of negotiation for the extension of a maturity date on a large commercial loan. After all, the original purpose of ECOA was to prevent unjustified discrimination against wives who were being denied credit in their own names despite their credit worthiness. *See, e.g., Anderson v. United Fin. Co.,* 666 F.2d 1274 (9th Cir.1982).

principal. Their request to be relieved of this requirement was itself clearly a request for an extension of credit above a previously established credit limit.

### B.

■ Mr. Webster's claim that Riggs violated 15 U.S.C. § 1691(a)(1) by requiring Mrs. Webster to sign the note for the loan is barred for three separate reasons. First, a two-year statute of limitations is applicable to such a claim. 15 U.S.C. § 1691e(f), and the triggering of the limitations period occurred in 1987 when Mrs. Webster signed the note. *See Marine American State Bank v. Lincoln,* 433 N.W.2d 709, 712 (Iowa 1988); *Ford City Bank v. Goldman,* 98 Ill.App.3d 522, 54 Ill.Dec. 11, 13, 424 N.E.2d 761, 763 (1981).[5]

Second, although Mr. Webster alone signed the loan application, Mrs. Webster was *de facto* a joint applicant for the loan. As stated above, the purpose of the loan was to refinance and renovate 33 N Street, an office building owned by Mrs. Webster. Further, the financial statement that Mr. Webster submitted in support of his loan application included in his statement of net worth properties that he owned jointly with Mrs. Webster and properties owned by Mrs. Webster solely in her own name.

Third, even if Mrs. Webster was not technically a joint applicant, this is an instance for the doctrine known colloquially as "no harm, no foul." Mr. Webster concedes (as he must) that Riggs could have required Mrs. Webster to sign not only lien documents, authorizing Riggs to foreclose against 33 N Street in the event of default, but also a guarantee on which she would be personally liable. That being the case, there was no difference in substance in requiring her to sign the promissory note itself instead—a requirement to which she made no contemporaneous objection. *Cf. United States v. Lowy,* 703 F.Supp. 1040, 1046–47 (E.D.N.Y. 1989).

### III.

■ The Websters' next claim is that Riggs breached its loan agreement with them by not basing its interest charge upon what the Websters understood would be the "Riggs Prime Rate." As framed in their original complaint, the Websters base this claim upon the allegation that the term "Riggs Prime Rate" is ambiguous and that the practice of the parties, established by their course of dealing prior to 1987 when the loan was made, defined the term "as the lowest floating rate charged by Riggs to its business, commercial and real estate customers." Complaint, ¶ 63.

The note itself unequivocally states that "the [Riggs] Prime Rate is not necessarily the lowest rate charged by the Bank on loans." Moreover, that clause aside, there is no ambiguity in the term "Riggs Prime Rate." The loan documents define that rate as "the rate announced from time to time by [Riggs] as its Prime Rate of Interest" and provided that "with respect to all matters relevant hereto, a certificate signed by an officer of [Riggs] setting forth the Prime Rate of [Riggs] in effect on any applicable day, shall be binding and conclusive on [the borrower]."[6] These clauses confer discretion upon Riggs to establish its own prime rate, and nothing in them suggests that in exercising its discretion Riggs had to take into account the Websters' expectation of what the prime rate should be (based upon the parties' past practice, rates charged by

---

**5.** Mr. Webster suggests that the statute of limitations should not apply because his discrimination claim is in the nature of a recoupment defense. Although at least one judge has so held, *see Fed. Deposit Ins. Corp. v. Notis,* 602 A.2d 1164, 1166 (Me.1992), I disagree with his analysis. The doctrine of recoupment properly applies in cases where equity demands that a defendant be given a credit that would be due to him but for a limitations bar when the plaintiff seeks to recover on a related debt. *See generally Bull v. United States,* 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935). Here, Mr. Webster is not due any credit from Riggs but is simply asserting the discrimination claim as a defense to the debt which he owes. To permit him to do so would, in effect, be to nullify the limitations statute which Congress has enacted.

**6.** The Websters also claim that, under the loan documents, Riggs was obligated to provide them with the certificate setting forth the "Prime Rate". Clearly, Riggs had no such contractual obligation.

other banks in the D.C. metropolitan area or otherwise).

This is not to say that in deciding the interest to charge to the Websters, Riggs' discretion was entirely unfettered. A degree of limitation is required to prevent the loan agreement from being so indefinite that it is unenforceable. *See, e.g., Walters v. First Tennessee Bank, N.A.,* 855 F.2d 267, 274 (6th Cir.1988), *cert. denied,* 489 U.S. 1067, 109 S.Ct. 1344, 103 L.Ed.2d 812 (1989). However, the restrictions on the exercise of Riggs' discretion are quite broad. All that the bank must do is to set its prime rate after a deliberative process in which objective factors, extraneous to the specific loan made to the Websters, are considered and to use the same prime rate in calculating the interest under all notes on which its "Prime Rate" is used as the basis.[7]

In their proposed amended counterclaim, the Websters allege (on information and belief) that, in fact, Riggs charged different "Prime Rates" to different customers. If that is true, the Websters may have a viable breach of contract claim. Accordingly, although Riggs' motion to dismiss their original contract claim will be granted, the Websters will be granted leave to file their amended counterclaim to the extent that it refines the contract claim. They will also be granted the opportunity to conduct discovery as to the questions of whether Riggs established its Prime Rate based upon objective factors and whether it applied that rate uniformly.

## IV.

■ As stated in the original complaint, the Websters' implied contract claim is based upon the allegation that "pursuant to understandings formed in 1987 and reinforced and evidenced over the next five years pursuant to a pattern of renewals of the loan, the parties formed, entered into, effectuated and performed pursuant to an implied contract for renewable financing of 33 N Street." Complaint, ¶ 68. That claim too fails as a matter of law. The third amendment to the

note dated September 30, 1990 provided that the Websters "shall be entitled to obtain a further extension of the Maturity Date until September 30, 1993, under the Consolidated Note ... in the event [the Websters] shall on or before September 30, 1992 prepay ... the sum of One Million Dollars...." As the Websters now concede, in light of this clause any allegations that Riggs impliedly agreed to renew the loan without condition is barred by the parol evidence rule. *See, e.g., Foreman v. Melrod,* 257 Md. 435, 441, 263 A.2d 559, 562 (1970); *Ozerol v. Howard Univ.,* 545 A.2d 638, 641 (D.C.App.1988), *on reh'g,* 555 A.2d 1033 (1989).

■ Changing theories, the Websters allege in their proposed amended counterclaim that the implied contract was created "in February and March 1992, [when] Riggs lead the Websters to believe that it would consider and grant one more three to five year extension if the Websters presented information and provided collateral requested by Riggs." Amended Counterclaim, ¶ 97. This allegation does not resurrect their claim. The Websters acknowledge, as they must, that they cannot assert a claim for breach of an express contract based upon anything which Riggs said in or prior to the March 2nd letter in light of the clear disclaimers in the letter that "only Special Assets Committee can approve the terms of this extension" and that "in no way are the terms discussed in this letter intended to be a loan commitment." These disclaimers equally defeat any implied contract claim. The purpose of the doctrine of implied contract is to bind the parties to an agreement which their conduct (but not their words) has formed, *see generally, Bloomgarden v. Coyer,* 479 F.2d 201, 208 (D.C.Cir.1973); it is not to permit a court to create contract rights whose very existence is expressly refuted by statements made by the party sought to be bound.

## V.

The Websters' claims for fraud and negligent misrepresentation have evolved through three stages. The Websters first alleged

---

7. This is not to say, of course, that Riggs must charge the same rate to all commercial customers. It is free not to refer to its Prime Rate at all in any particular loan agreement or, in those instances in which it does, to negotiate any rate at, above or below the Prime Rate.

that Riggs falsely represented to them that it would grant an extension of the loan on the terms stated in the February 1992 meeting between the parties and Riggs' March 2, 1992 letter. They abandoned that claim when faced with Riggs' response that they could not have reasonably relied upon the representations allegedly made to them in light of the disclaimers made in the March 2nd letter, namely, that any extension had to be approved by Riggs' Special Assets Committee and that the letter did not in any way constitute a commitment on the part of the bank. *See, e.g., Foremost Guar. Corp. v. Meritor Sav. Bank,* 910 F.2d 118, 125–26 (4th Cir.1990); *One–O–One Enterprises, Inc. v. Caruso,* 848 F.2d 1283, 1286–87 (D.C.Cir. 1988); *Runnemede Owners, Inc. v. Crest Mortgage Corp.,* 861 F.2d 1053, 1058–59 (7th Cir.1988).

The Websters next claimed that Riggs falsely represented to them that it would "consider" an extension of the loan when, in fact, it had no intention to do so. However, they have withdrawn that claim as well in light of the overwhelming evidence that, although the final decision was not to the Websters' liking, Riggs certainly "considered" whether or not to grant the extension which they requested.

█ As finally articulated, the Websters' misrepresentation claims are founded upon the allegation that Riggs falsely represented to them that it would consider granting an extension on the terms stated in the March 2nd letter without disclosing that, in fact, the bank would insist upon the fulfillment of two additional conditions: the obtaining of a new appraisal on the 33 N Street property confirming its previously appraised value ($5,000,000) and the execution of a long-term lease by the District of Columbia, the tenant at the 33 N Street building. This claim is as equally lacking in merit as are its predeces-

sors. The March 2nd letter was on its face the beginning, not the end of the underwriting process and unequivocally stated that the Special Assets Committee would have to approve any extension. If the Committee had the right to disapprove the extension, *a fortiori* it had the right to impose additional conditions before approving it.

This is particularly true since the two additional conditions allegedly not disclosed by Riggs could have been reasonably anticipated by the Websters from the March 2nd letter itself. In the letter Riggs made it clear that it had to have additional collateral (specifically a first trust on the 50 Patterson Street property) which was "sufficient to reduce the Loan–To–Value Ratio on 33 N Street to 80%." Obviously, achievement of that ratio required that 33 N Street had maintained its appraisal value and that it would continue to do so in the foreseeable future. Thus, the obtaining of an updated appraisal and the requirement that the tenant at the property sign a long-term lease were not bolts from the blue but well within the parameters of normal underwriting. The alleged nondisclosure of these conditions is far too weak a foundation upon which to construct a fraud or negligent misrepresentation claim. *Compare Parker v. Columbia Bank,* 91 Md.App. 346, 360–62, 604 A.2d 521, 528 (1992).

### VI.

█ In their proposed amended counterclaim the Websters assert one entirely new claim for tortious interference with contract. That claim is based upon the allegation that Casey Brill of Riggs contacted the District of Columbia government, the tenant at 33 N Street, advised the District of Columbia government that Riggs was reviewing the Websters' loan and asked if the government expected to stay at the property after the leases had expired.[8] According to the Web-

---

**8.** The evidence is undisputed that Brill made his calls to the District of Columbia government after reading an article in the Washington Post which stated that parts of the District's Department of Human Services were being moved to St. Elizabeth's Hospital. Although this fact is not alleged in the amended counterclaim, since it is undisputed it can be considered in determining whether to grant the motion for leave to

amend counterclaim would be futile. Even leaving it aside, however, the amended counterclaim still does not state a claim upon which relief can be granted.

I might also note that it appears from the factual record that it is extremely unlikely that Brill's calls had any effect whatsoever upon the District of Columbia government's lease negotiations with the Websters. However, since the

sters, this undermined the Websters' negotiating position with the District of Columbia government.

These allegations do not make out a claim of tortious interference with contract. Phone calls asking whether a tenant intends to remain at premises where it is housed hardly seems to constitute "interference." Further, at the time that Brill made his calls, the 33 N Street property was the collateral for the loan which Riggs had made to the Websters, and Riggs had a lien interest in the property. Thus, the bank had a privilege to make the inquiry which it did, and that privilege negates malicious motives on the part of the bank. *See, e.g., Zoby v. American Fidelity Co.*, 242 F.2d 76, 79–80 (4th Cir.1957). On deposition Mr. Webster admitted that he knows of no facts from which he could show malicious intent on the part of the bank and the amended counterclaim casts no further light on the issue.

For these reasons, Riggs' motion to dismiss the Websters' claims for ECOA violations, breach of contract and breach of implied contract will be granted. Similarly, its motion for summary judgment as to the Websters' claims for fraud and negligent misrepresentation will be granted. The Websters' motion for leave to file an amended counterclaim will be granted to the extent that it amends their claim for breach of contract but will otherwise be denied.

### ORDER

For the reasons stated in the memorandum being entered herewith, it is this 13th day of August 1993

ORDERED

1. The motion to dismiss filed by the Riggs National Bank of Washington, D.C. ("Riggs") as to Counts I–III, Count V and Count VI of the original answer and counterclaim filed by Edward R. and Margaret Webster ("Websters") is granted;

2. Riggs' motion for summary judgment as to Counts IV and VII of the Websters' original answer and counterclaim is granted;

3. The Websters' motion for leave to file an amended answer and counterclaim is granted to the extent that it amends Count V of the counterclaim but is otherwise denied; and

4. Riggs' motion for summary judgment as to its complaint on the promissory note is deferred until further ruling on Count V of the Websters' amended counterclaim.

---

Websters have moved to take additional discovery on the point (a motion which I am denying),

I am not considering the asserted lack of damage in denying their motion for leave to amend.