**Janice SILVERMAN**

v.

**EASTRICH MULTIPLE INVESTOR FUND, L.P.**

Civ. A. No. 94–2881.

United States District Court, E.D. Pennsylvania.

July 13, 1994.

Neil Jokelson, Philadelphia, PA, for plaintiff.

Thomas Elliott, Blue Bell, PA, for defendant.

## MEMORANDUM

DALZELL, District Judge.

Plaintiff Janice Silverman filed this action against defendant Eastrich Multiple Investor Fund, L.P. ("Eastrich"), alleging that Eastrich violated her rights under the Equal Credit Opportunity Act (the "ECOA"), 15 U.S.C. §§ 1691–1691f, by requiring her to guarantee a loan it made to her husband and his company.[1]  Mrs. Silverman seeks not only damages, but also protection from the enforcement of a $10 million state court judgment against her as guarantor.

Shortly after filing the complaint, Mrs. Silverman filed a "petition" for a preliminary injunction, asking us to enjoin Eastrich from executing on its state court judgment.  Later, Eastrich filed a motion to dismiss Mrs. Silverman's complaint for failure to state a claim upon which relief may be granted.

On June 6, 1994, we held a preliminary injunction hearing at which both Mr. and Mrs. Silverman testified.  At the conclusion of the hearing, we ordered the parties to submit supplemental memoranda on a few

---

1.  Eastrich is potentially liable as a successor in interest to two other entities as well as in its own right.

Mrs. Silverman's complaint also asserted two state law causes of action which she subsequently withdrew.  *See* Silverman's supplemental brief at 14.

particularly complex issues, and Eastrich agreed not to execute on its judgment until we ruled on Mrs. Silverman's motion. Both parties also agreed to our treating of the preliminary injunction motion as a motion for final injunctive and declaratory relief.

After careful consideration of the briefs and the parties' arguments at the hearing, we will deny Mrs. Silverman's motion for injunctive relief and grant Eastrich's motion to dismiss the complaint. The following will constitute our Rule 52(a) findings and conclusions as to Mrs. Silverman's motion for a final injunction and declaration, and our Rule 12(b)(6) analysis for any residual legal claims she may be regarded to have asserted.

*Background*

The undisputed facts of this case, as established at the preliminary injunction hearing, are that Janice Silverman is a professor who has taught theater at Temple University since 1975. Her husband of thirty years, Leon Silverman, is a lawyer and entrepreneur who engages in commercial real estate businesses. Some of Mr. Silverman's ventures have stemmed from his partnership in a New Jersey general partnership known as Hunt's Pier Associates ("Hunt's Pier").

On February 2, 1986, Atlantic Financial Federal ("Atlantic Financial"), a federally-chartered savings and loan institution, loaned $10 million to Hunt's Pier. With that money, Hunt's Pier purchased a number of properties at the South Jersey shore. Although Mrs. Silverman, unlike her husband, was not a partner in Hunt's Pier, Atlantic Financial required that she sign a personal guaranty securing the loan, and she did so at the closing held in Atlantic Financial's counsel's office on February 28, 1986.[2] Mr. Silverman and his three partners in Hunt's Pier also signed loan guarantees at Atlantic Financial's request.

On January 11, 1990, the Office of Thrift Supervision, Department of the United States Treasury, declared Atlantic Financial insolvent and ordered it closed. Thereafter, the Resolution Trust Corporation (the "RTC") took control of Hunt's Pier's loan. Hunt's Pier subsequently defaulted on the loan and, on May 23, 1991, the RTC issued a notice of default and accelerated the debt.

In October of that year, Hunt's Pier filed for reorganization under Chapter 11 of the Bankruptcy Code and, on February 10, 1993, the United States Bankruptcy Court for the Eastern District of Pennsylvania confirmed Hunt's Pier's Third Amended Plan of Reorganization (the "Reorganization Plan" or the "Plan"). The Reorganization Plan did not release Hunt's Pier from its principal obligations on the $10 million loan,[3] but it did extend the dates for the payment of principal and interest on the loan, ultimately extending the term of the note from February of 1991 to February of 1998. Reorganization Plan at 19. The Plan further provided that it did not affect the RTC's rights and remedies under the Loan Documents, including, but not limited to, "its rights and remedies under any guarantee executed by any of [the Proponents of the Plan] in connection with the Loan Documents, which rights and remedies shall continue to be enforceable unaffected by the modification of the Loan Documents provided by this Plan." *Id.* at 20; *see also id.* at 12.

On August 18, 1993, defendant Eastrich purchased all of the RTC's rights in the loan. Less than a year later, on April 21, 1994, Eastrich confessed judgment against the loan guarantors in the Philadelphia Court of Common Pleas.

---

2. Although the guaranty is dated February 28, 1986, the testimony at the hearing appeared to be that Mrs. Silverman signed the agreement on the 26th of that month. Transcript of Preliminary Injunction Hearing at 18. In any case, the two day discrepancy is not material to any issue presented in this case.

3. The Reorganization Plan provides that:
The Debtor shall continue on and after the Effective Date [of the Reorganization Plan] to be bound by its obligations under the terms of the Loan Agreement and Security Agreement, the Note, the Mortgage, the Collateral Assignment of Leases, and all other agreements and instruments delivered by the Debtor in connection with the $10 million loan made by Atlantic Financial Federal (collectively, the "Loan Documents")....
Reorganization Plan at 12.

On May 9, 1994, Mrs. Silverman filed her complaint here. In the complaint, she alleges that Atlantic Financial violated her rights under the ECOA in 1986 by requiring her to guarantee the $10 million loan. She also contends that her rights were violated in the Bankruptcy Court proceedings when the loan was said to have been renewed and the RTC failed to release her from her obligation under the guaranty. Finally, Mrs. Silverman asserts that Eastrich violated the ECOA when it instituted state court collection proceedings against her.

*Discussion*

Under the ECOA, it is unlawful "for any creditor to discriminate against any [credit] applicant with respect to any aspect of a credit transaction on the basis of ... marital status." 15 U.S.C. § 1691(a)(1). In particular, Federal Reserve Board Regulation B, the ECOA's implementing regulation, 12 C.F.R. §§ 202.1–202.14, states that:

> a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested.

12 C.F.R. § 202.7(d)(1).

Earlier regulations under the Act defined "applicant" as:

> any person who requests or who has received an extension of credit from a creditor, and includes any person who is or may be contractually liable regarding an extension of credit *other than* a guarantor, surety, endorser, or similar party.

12 C.F.R. § 202.0(e) (1985) (cited in *Stern v. Espirito Santo Bank of Florida*, 791 F.Supp. 865, 867 (S.D.Fla.1992)) (emphasis added). In the mid-eighties, however, the Board of Governors of the Federal Reserve System (the "Federal Reserve Board") adopted a revised Regulation B to include guarantors, sureties and endorsers as applicants. Specifically, the amended regulation defines an "applicant" as:

> any person who requests or who has received an extension of credit from a creditor, and includes any person who is or may

become contractually liable regarding an extension of credit. For purposes of § 202.7(d), the term includes guarantors, sureties, endorsers and similar parties.

12 C.F.R. § 202.2(e). Along with the revised Regulation B, the Board of Governors issued a directive as to its effective date. That directive stated that:

> The revised regulation and official staff commentary will become effective December 16, 1985. However, creditors have the option of continuing to comply with the Board's current regulation and existing interpretations, which remain in effect until October 1, 1986.

50 Fed.Reg. 48,018 (1985).

The only other definition of "applicant" that is relevant to the instant case is found in the ECOA itself. There, "applicant" is defined to include a person who applies to a creditor for a renewal. 15 U.S.C. § 1691a(b). Thus, in accordance with 12 C.F.R. § 202.-7(d)(1), "[i]f the borrower's creditworthiness is reevaluated when a credit obligation is renewed, the creditor must determine whether an additional party is still warranted and, if not, release the additional party." *Stern*, 791 F.Supp. at 869 (quoting Official Staff Commentary on Regulation B, as amended effective April 1, 1990, 55 Fed.Reg. 12,472 (1990)). Moreover, the creditor has "an affirmative obligation ... to reevaluate the need for an additional party when a credit obligation is renewed, and to do so without discriminating on the basis of marital status...." 791 F.Supp. at 869.

As we stated above, Mrs. Silverman points to three events as constituting impermissible discrimination under ECOA. The first was Atlantic Financial's requiring her to sign the original loan guaranty on February 26, 1986. The second was the Bankruptcy Court's approval of the Reorganization Plan which allegedly "renewed" the original loan, and the third was Eastrich's institution of collection proceedings. We will address Mrs. Silverman's right to recover for each event in turn.

a. *The February 26, 1986 Guaranty*

With regard to the first event, the signing of the February 26, 1986 guaranty, Eastrich

contends that Mrs. Silverman lacks standing under the ECOA to pursue a claim. Alternatively, Eastrich argues that Mrs. Silverman cannot prevail because Eastrich is not an ECOA creditor and, in any event, the claim is barred by the ECOA's two-year statute of limitations.

### i. Standing

■ Because only applicants are permitted to bring civil actions under ECOA, *see Stern,* 791 F.Supp. at 867, in order to ascertain whether Mr. Silverman has standing to maintain a claim against Eastrich, we must determine whether Mrs. Silverman qualified as an "applicant" on the date of the alleged violation.

The answer to this question hinges on our application of the Federal Reserve Board's directive published in the *Federal Register* regarding the effective date of the revised regulation which added guarantors to the definition of "applicant". That directive, which we quoted above, stated that the regulation was to become effective on December 16, 1985 but that creditors were not required to comply with the regulation until October 1, 1986. 50 Fed.Reg. 48,018.

In light of the perplexing nature of the directive and the parties' conflicting interests, it is not surprising that Mrs. Silverman contends that the regulation became effective on December 16, 1985 and Eastrich insists that it was not effective until October 1, 1986. If Mrs. Silverman is correct and the operative date is December 16, 1985, Mrs. Silverman was an "applicant" on February 26, 1986. On the other hand, if Eastrich is correct and the regulation did not become effective until October 1, 1986, then Mrs. Silverman was not an "applicant" on the date of the alleged violation and lacks standing to pursue a claim on the 1986 guaranty.

We have found little caselaw to guide us in our resolution of the paradoxical effective date(s) published in the *Federal Register*. In its brief, Eastrich cites *Boatmen's First National Bank v. Koger,* 784 F.Supp. 815 (D.Kan.1992), a case which holds that "compliance with the revised Regulation B was not mandatory until October 1, 1986". 784 F.Supp. at 816. The court in *Koger,* however, did not even acknowledge the existence of the earlier and apparently conflicting date. *Id.* We therefore find *Koger* to be unhelpful.

Furthermore, as the following analysis will show, a close examination of the 1985 revisions to Regulation B makes clear that (1) the two dates in the *Federal Register* can be reconciled and (2) the new definition's effective date was December 16, 1985.

The Federal Reserve Board made two types of changes to Regulation B in 1985, "procedural" and "substantive". 50 Fed.Reg. 48,018. The procedural changes, for the most part, required creditors to institute operational changes.[4] In contrast, the substantive changes did "not require changes in operational procedures". *Id.* The new definition of "applicant" falls into the latter category. In fact, the *Federal Register* entry specifically states that "[t]he revised definition of applicant gives legal standing to guarantors and like parties (enabling them to sue for violations of the regulation's signature rules) *but imposes no new requirements on creditors."*[5] 50 Fed.Reg. 48,018 (emphasis added).

Once we understand that some of the revisions required creditors to change their procedures and others did not, the rationale behind, and function of, the two dates becomes apparent. The only logical way to reconcile the two dates is to recognize that the earlier date, December 16, 1985, was the

---

4. For example, the new regulations required creditors to make a notation as to an applicant's sex and race on certain credit applications and prescribed procedures for a creditor to follow in notifying an applicant that his or her application is incomplete. *See id.*

5. Even before the new definition of applicant went into effect, the regulations forbade creditors from requiring a spouse's signature on a note when the applicant individually qualified for the loan. *See* 12 C.F.R. § 202.7(d)(1) (1979) (cited

in *Anderson v. United Finance Co.,* 666 F.2d 1274, 1276 (9th Cir.1982)). Although a guarantor could not enforce this rule before the new definition became effective, the person who requested the loan and was asked to provide their spouse's signature could enforce it. *See* 12 C.F.R. § 202.2(e) (1985) (cited in *Stern,* 791 F.Supp. at 867). Creditors were therefore obligated to comply with the signature rule even prior to the 1985 revisions.

official date for the revisions to go into effect, but the Federal Reserve Board provided creditors with a grace period until October 1, 1986 to institute the new operational procedures necessary to comply with the procedural changes.[6]

Applying the Federal Reserve Board's apparent logic, we note that because the change in the definition of "applicant" "impose[d] no new requirements on creditors", it did not require creditors to alter their procedures and could go into effect on December 16, 1985 without causing creditors any inconvenience. We therefore find that the new definition went into effect on December 16, 1985, and thus Mrs. Silverman qualified as an "applicant" in February of 1986, thereby conferring standing on her to bring a claim arising out of the February 26, 1986 guaranty.

### ii. *Statute of Limitations*

Having concluded that Mrs. Silverman has the requisite standing to maintain a claim for the events occurring on February 26, 1986, we nevertheless find that the two year statute of limitations on ECOA claims bars that claim.[7] *See* 15 U.S.C. § 1691e(f).

The parties do not dispute that Mrs. Silverman's claim as to the February 26, 1986 guaranty accrued when she signed the guaranty.[8] *See Riggs National Bank v. Webster,* 832 F.Supp. 147, 151 (D.Md.1993); *Stern,* 791 F.Supp. at 868. The statute of limitations therefore expired two years after that date, on February 26, 1988, and Mrs. Silverman's May 9, 1994 filing of the instant action fell far outside of the statutory period. Accordingly, her claim on the original 1986 guaranty is time-barred.

Nevertheless, Mrs. Silverman argues that even if the statute of limitations bars an affirmative claim for damages under the ECOA, it does not bar a claim based on her

right of recoupment. In support of this position, she cites *Integra Bank v. Freeman,* 839 F.Supp. 326 (E.D.Pa.1993), a case in which the court permitted a defendant to assert an alleged ECOA violation as a defense to liability. Even though the statute of limitations had run on the affirmative ECOA claim in that case, the court found that the defensive ECOA claim was not time-barred because recoupment claims are "never barred by the statute of limitations so long as the main action itself is timely." *Id.* at 330 (quoting *Bull v. United States,* 295 U.S. 247, 262, 55 S.Ct. 695, 700–01, 79 L.Ed. 1421 (1935)). The court reasoned that "[t]o permit creditors—especially sophisticated credit institutions—to affirmatively benefit by disregarding the requirements of the ECOA would seriously undermine the Congressional intent to eradicate gender and marital status based credit discrimination." 839 F.Supp. at 329.

The Court in *Integra Bank* also noted, however, that other courts "that have confronted the issue of whether an ECOA violation can be asserted defensively ... have determined that an ECOA violation—if proved—does not render the offending instrument void." *Id.* at 329 (citing *Diamond v. Union Bank & Trust,* 776 F.Supp. 542, 544 (N.D.Okla.1991); *CMF Virginia Land, L.P. v. Brinson,* 806 F.Supp. 90 (E.D.Va.1992)). As one court stated:

> The ECOA, by its own terms, sets forth the contemplated remedy under the statute—a federal civil action for actual damages, punitive damages not to exceed $10,000, attorneys' fees or injunctive relief. Nowhere does it afford relief by way of an affirmative defense.

*Virginia Land,* 806 F.Supp. at 95; *see* 15 U.S.C. § 1691e. Furthermore, that court stated that "[i]nvalidation of the debt itself is a remedy too drastic for the court to imple-

---

6. Even Eastrich concedes that "it seems logical that the ... inclusion of the two dates was merely meant to allow financial institutions a period of time ... to implement the changes before they [became] mandatory." Eastrich's supplemental memorandum of law at 5.

7. Because Mrs. Silverman's claim is barred by the statute of limitations, we need not address Eastrich's argument that it is not a "creditor" within the meaning of the ECOA.

8. Mrs. Silverman does argue that Eastrich's institution of collection proceedings "revived" the statute of limitations on her claim. As we will explain below, however, the institution of collection proceedings is not, in itself, a violation of the ECOA and therefore cannot provide a basis for relief.

ment simply by reading between the lines of the ECOA." *Virginia Land,* 806 F.Supp. at 95 (quoted in *Integra Bank,* 839 F.Supp. at 329).

■ We too believe that the ECOA's statutory scheme does not contemplate the invalidation of a guaranty as a remedy for an ECOA violation, and that a defensive use of the ECOA is therefore impermissible. Although the statute provides that courts "may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under this subchapter", 15 U.S.C. § 1691e(c), if Congress had meant for the equitable relief to include the Draconian remedy of invalidation of the guaranty, it surely would have specifically included such voiding as a remedy.[9] In short, if Congress had intended the ECOA to be used as a shield as well as a sword, it would have said so.

Furthermore, because a guaranty by its nature gives rise only to a contingent liability, we do not read the statute to provide that there is a two-year statute for affirmative claims under the ECOA but that, no matter when the creditor tries to collect on the guaranty, a guarantor may avoid its enforcement if there has ever been an ECOA violation. Such a rule would effectively read the statute of limitations out of existence because although a guarantor's use of the ECOA as a shield to liability would exclude the punitive damages available on an affirmative claim, the guarantor's right to avoid liability at any time on the guaranty would be a right more valuable than any primary remedy under the ECOA.[10] Such a reading as applied here would void a $10 million obligation at the cost of (at most) a $10,000 punitive damage right and her counsel fees. We find this too extravagant a result absent clear Congressional direction to compel it.

Because we decline to read a remedy into the ECOA that negates the effect of the statute's limitations period, we find that Mrs. Silverman cannot use the alleged ECOA defensively in order to assert a right of recoupment against Eastrich. Since we have also concluded that any affirmative claims arising from the February of 1986 guaranty are barred by the two year statute of limitations, we will dismiss all claims arising from that guaranty, and deny Mrs. Silverman's related request for injunctive relief.

#### b. *The Bankruptcy Plan*

With regard to the RTC's approval of the Reorganization Plan, the second event on which Mrs. Silverman bases a claim, the parties disagree as to whether the approval constituted a ECOA renewal.[11] If the approval of the Plan did constitute an ECOA-triggering renewal, as Mrs. Silverman argues, the RTC had an affirmative obligation to reevaluate the need for Mrs. Silverman's guaranty. *See Stern,* 791 F.Supp. at 869. We are, however, aware of no authority that would require such reevaluation if the approval was not a renewal.

Mrs. Silverman, in support of her contention that the approval was a renewal, points to the Official Commentary to the ECOA which explains that the ECOA and Regulation B "apply to all credit" and that "[i]f a transaction provides for the deferral of the payment of a debt, it is credit covered by Regulation B . . . ." Comment to 12 C.F.R. 202.1(a), Official Staff Commentary on Regulation B, as amended effective December 16, 1985, 50 Fed.Reg. 48,048 (1985). Noting that the Reorganization Plan deferred payment on the $10 million loan, Mrs. Silverman contends that when the RTC approved the Plan, it was engaging in a renewed credit transaction that was subject to the requirements of the ECOA and Regulation B. Mrs. Silverman then argues that by not releasing her

---

**9.** Voiding impermissible provisions is a device the Congress has commonly used, for example, in the securities field. *See, e.g.,* § 14 of the Securities Act of 1933, 15 U.S.C. § 77n; § 29(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(a); § 327 of the Trust Indenture Act of 1939, 15 U.S.C. § 77aaaa.

**10.** That is, the right to collect "actual damages" within the meaning of the ECOA. Such "[a]ctual

damages may include out-of-pocket monetary losses, injury to credit reputation, and mental anguish, humiliation or embarrassment." *Anderson,* 666 F.2d at 1277 (citations omitted).

**11.** Both the ECOA and Regulation B are silent as to their application in the bankruptcy context. Similarly, the Bankruptcy Code says nothing of its relationship to the ECOA and Regulation B.

from her obligations under the guaranty, the RTC violated the ECOA's rules prohibiting discrimination based on marital status.

Although Mrs. Silverman's analysis, on its face, appears sound, it fails to take account of the differing contexts in which extensions of credit can take place. When Regulation B speaks of a credit renewal, it is presumably contemplating a creditor's ordinary course of business decision to renew a debtor's credit. This private and consensual restructuring of debt is far-removed from the kind of restructuring done in the context of a Chapter 11 bankruptcy.

Once a debtor files a Chapter 11 bankruptcy petition, that debtor's creditors are no longer free to make ordinary course of business decisions with regard to the debtor. Rather, the creditor is subject to the jurisdiction of the Bankruptcy Court and all of its decisions with regard to the bankrupt are subject to the purview of that court. Moreover, the Bankruptcy Court may confirm a plan of reorganization that restructures the bankrupt's debts to a creditor even if the affected creditor objects to the plan. *See, e.g., In re Monroe Well Service, Inc.,* 80 B.R. 324, 334 (E.D.Pa.1987) (citing 11 U.S.C. § 1141(a)).

It is precisely because of their vulnerable position in bankruptcy proceedings that creditors obtain guarantees of debt. Such guarantees are calculated "to provide an alternative source of repayment in the event that [the borrower goes] bankrupt", *Mellon Bank v. Siegel,* 96 B.R. 505, 506 (E.D.Pa.1989), and thereby provide creditors with insurance against the primary borrower's bankruptcy.

Apparently recognizing the importance of these guarantees to creditors, bankruptcy law holds that the discharge of a debt in a Bankruptcy Court's plan of reorganization does not affect the obligations of the guarantors of that debt.[12] *Mellon Bank,* 96 B.R. at 506 (citing *FR. Winkler KG v. Stoller,* 839 F.2d 1002, 1008 (3d Cir.1988)). In fact, the Bankruptcy Code specifically provides that:

Except as provided in subsection (a)(3) of this section [not applicable here], discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

11 U.S.C. § 524(e). Thus, "[w]hile the Bankruptcy Code expressly alters the contractual obligations of the bankrupt, it does not contemplate the same effect on the obligations and liabilities of third parties to a creditor." *Mellon Bank,* 96 B.R. at 506. Accordingly, "a Bankruptcy Court has no power to discharge the liabilities of a bankrupt's guarantor who is not a party to the Chapter 11 proceedings." *Mellon Bank,* 96 B.R. at 506 (citing *Union Carbide Corp. v. Newboles,* 686 F.2d 593, 595 (7th Cir.1982); *Underhill v. Royal,* 769 F.2d 1426, 1432 (9th Cir.1985)).

In accordance with bankruptcy law's protection of creditors' interests in their guarantees, we find that the restructuring of a debt in the bankruptcy context cannot constitute an ECOA renewal. A contrary holding would put creditors at risk of losing the protection of otherwise enforceable guarantees, a consequence Congress explicitly sought to avoid in § 524(e) of the Bankruptcy Code, by permitting the resurrection of ECOA claims that the statute of limitations would have barred in the absence of a renewal. We therefore decline to consider such bankruptcy reorganizations to be ECOA renewals.

We thus conclude that the RTC's approval of the Reorganization Plan did not constitute a renewal requiring new compliance with the ECOA and Regulation B. Accordingly, Mrs. Silverman cannot sustain an ECOA claim for either injunctive relief or damages based upon the RTC's approval of the Reorganization Plan.

### c. *Institution of Collection Proceedings*

Since we have already held that the approval of the Reorganization Plan did not constitute a renewal of Mrs. Silverman's obligations under the Guaranty, all of Mrs. Silverman's guaranty obligations necessarily

---

**12.** This principle is also reflected in the terms of the Reorganization Plan here. *See* Reorganization Plan at 12, 20.

arise out of the guaranty that she signed on February 26, 1986. As we have also concluded, however, the statute of limitations bars any ECOA claim arising from the 1986 guaranty. Since the institution of collection proceedings does no more than give effect to what Mrs. Silverman agreed to in February of 1986, it cannot constitute a new and independent act of discrimination giving rise to its own statute of limitations. *See Stern,* 791 F.Supp. 865, 868–69.

We therefore find that Eastrich's institution of collection proceedings does not revive Mrs. Silverman's ECOA rights that died in 1988.

*Conclusion*

Although the consequences may be difficult for Mrs. Silverman, fidelity to the statutes Congress adopted leads us to conclude that she has no claim against Eastrich under the ECOA and Regulation B. We are therefore constrained to deny Mrs. Silverman's petition for injunctive relief and grant Eastrich's motion to dismiss.

### ORDER AND JUDGMENT

AND NOW, this 13th day of July, 1994, upon consideration of plaintiff's petition for a preliminary injunction, defendant's response thereto, defendant's motion to dismiss, plaintiff's response thereto, and the parties' supplemental briefing, and after a hearing on June 6, 1994, for the reasons set forth in the foregoing memorandum, it is hereby ORDERED that:

1. Plaintiff's petition for a preliminary injunction is DENIED;

2. Defendant's motion to dismiss is GRANTED;

3. JUDGMENT IS ENTERED in favor of defendant and against plaintiff; and

4. The Clerk shall CLOSE this matter for statistical purposes.