

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-13-1995

# Midlantic v Hansen

Precedential or Non-Precedential:

Docket 93-5120

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Midlantic v Hansen" (1995). *1995 Decisions*. Paper 46.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/46

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 93-5120 and 93-5160

_____


MIDLANTIC NATIONAL BANK


Appellee,


vs.


E. F. HANSEN, JR.; G. EILEEN HANSEN; HANSEN
BANCORP, INC.


Appellants.


_____



APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. Civil No. 92-02670)

_____



ARGUED MARCH 8, 1994

BEFORE:  MANSMANN, LEWIS and SEITZ, Circuit Judges.

(Filed February 13, 1995)

_____

David L. Braverman (ARGUED)
Fellheimer, Eichen & Braverman
One Liberty Place, 21st Floor
1650 Market Street
Philadelphia, PA  19103-7334

Attorneys for Appellants

Richard W. Hill (ARGUED)
Gary A. Kruse
McCarter & English
100 Mulberry Street
Four Gateway Center
Newark, NJ  07101-0652

     <u>Attorneys for Appellee</u>

———————

OPINION OF THE COURT

———————

LEWIS, <u>Circuit</u> <u>Judge</u>.

     This case presents the jurisdictional question of the citizenship of an inactive corporation under the federal diversity statute.  We conclude that an inactive corporation is a citizen of the state of its incorporation only.  Having so concluded, and thus having determined that the district court had, and we have, jurisdiction, we are also called upon to address the meaning of the term "joint applicant" under the Equal Credit Opportunity Act.  Because we agree with the district court's conclusion that one of the defendants, Mrs. Eileen Hansen, was a joint applicant for a loan for purposes of the Act, we will affirm.

I.

     Midlantic National Bank ("Midlantic") is a national banking association with its principal place of business in Edison, New Jersey.  Appellants Elmer and Eileen Hansen are citizens of Pennsylvania and are the joint owners of all the issued and outstanding stock of Hansen Bancorp, Inc. ("HBI").

HBI, now inactive, is a corporation organized under the laws of the state of Delaware. HBI owned the stock of two thrift institutions, the Hansen Savings Bank of Florida and the Hansen Savings Bank, SLA, in New Jersey.[1]

Beginning in 1985, the Hansens obtained several loans from Midlantic. The Hansens used the first Midlantic loan to finance the purchase of a New Jersey thrift institution, the Raritan Valley Savings and Loan Association located in East Brunswick, New Jersey. As collateral for this loan, the Hansens pledged the Raritan stock to Midlantic. As part of their loan application, the Hansens submitted a Consolidated Statement of Net Worth and a Consolidated Income Statement. The Notes to the Consolidated Statement of Net Worth, which explain the basis of consolidation, report that "E.F., Jr. and G.E. Hansen, his wife, operate their business, Hansen Properties ("Hansen"), as a sole proprietorship." The Notes then list limited partnerships of which the Hansens were the only partners or the only principals. (Plaintiffs/Appellees' Appendix ("Pa.") at 487) In addition, on the Acquisition Agreement between Raritan Valley Financial Corporation and the Hansens, the Hansens are listed as joint purchasers of the Raritan stock.

During 1987 and 1988 the Hansens used an additional Midlantic loan to purchase a controlling interest in a Florida

_____

[1]. The Hansens refer to these thrift entities by different names, calling the Florida thrift the Hansen Savings Midlantic of Florida, and the New Jersey thrift the Hansen Savings Midlantic, SLA.

thrift later renamed the Hansen Savings Bank of Florida (HSB of FL). This loan was secured by a pledge of HSB of FL stock. At this time the Hansens consolidated their indebtedness to Midlantic into a single loan in the amount of $13 million.

In February, 1989, the Hansens and Midlantic executed a Second Amended and Restated Loan Agreement, by which terms the Hansens and HBI were jointly and severally liable on a $13,166,666.69 term note payable to Midlantic. At the same time, the Hansens signed a separate One Million Dollar Term Note payable to Midlantic, under which they were also jointly and severally liable. One month later the Hansens signed an additional note for two million dollars. For all these loans the Hansens pledged as security the stock in HBI and its subsidiaries, HSB of FL and the Hansen Savings Bank, SLA.

In March of 1989, the Hansens borrowed an additional two million dollars from Midlantic, and in mid-1990, the Hansens and Midlantic executed two Demand Notes for $100,000 each.

By September of 1990, the Hansens were in default on several of their Midlantic loans. The parties then entered into a Loan Coordination, Security and Intercreditor Agreement, in which Midlantic agreed to postpone acceleration of sums due under the already executed notes until the earlier of either June 30, 1991, or a default under the Intercreditor Agreement. By 1992 the Hansens were in default on the Intercreditor Agreement.

In January, 1992, the Office of Thrift Supervision and the Resolution Trust Corporation seized control of the Hansens' Florida and New Jersey thrifts. HBI was rendered inactive by

this seizure.[2]  Midlantic initiated this collection action six months later, on June 25, 1992, for the recovery of the amounts loaned by Midlantic to the Hansens.  Midlantic's complaint bases the existence of subject matter jurisdiction upon 28 U.S.C. § 1332.

The district court denied a motion to dismiss for lack of subject matter jurisdiction filed by the Hansens and, on January 6, 1993, granted Midlantic's motion for summary judgment. On January 26, 1993, the district court entered final judgment in favor of Midlantic.  The Hansens filed their notice of appeal on February 25, 1993.  In their appeal of the district court's entry of summary judgment, the Hansens challenge the existence of federal diversity jurisdiction as well as the propriety of Midlantic's requiring Mrs. Hansen to sign the loan applications. In turn, Midlantic claims that the Hansens failed to file a timely notice of appeal.  Because we find that the Hansens' notice of appeal was timely filed, we will consider the issues raised therein.  Because we agree with the district court on all of the issues raised, we will affirm.

---

[2].    The Hansens explain that "[a]s HBI is a holding company, and all of its holdings were seized, HBI was forced to cease actively engaging in business at this time[,]" and that "[s]ince the seizure, HBI has been an inactive corporation except for activities relating to the institution of litigation against the O[ffice of Thrift Supervision and other federal agencies." (Appellants' brief at 16).

II.

First, we must address whether the district court had jurisdiction over the subject matter in this case. We exercise plenary review over issues of jurisdiction. Mellon Bank v. Farino, 960 F.2d 1217, 1220 (3d Cir. 1992).

To satisfy the jurisdictional requirements of 28 U.S.C. § 1332(a)(1), the federal diversity statute, diversity must be complete; that is, no plaintiff can be a citizen of the same state as any of the defendants. Carden v. Arkoma Assocs., 494 U.S. 185, 187 (1992); Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp., 461 F.2d 1140, 1142 (3d Cir. 1972). Whether diversity jurisdiction exists is determined by examining the citizenship of the parties at the time the complaint was filed. See Smith v. Sperling, 354 U.S. 91, 93 n.1 (1957) (stating that jurisdiction is tested by the facts as they exist when the action is brought). Thus, the question before us is whether HBI was a citizen of New Jersey in June of 1992, when Midlantic filed its complaint. If so, diversity of citizenship would not be complete since Midlantic is also a citizen of New Jersey.

For purposes of diversity jurisdiction, "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business . . . ." 28 U.S.C. § 1332(c). The Hansens contend that HBI's principal place of business was New Jersey at the time

Midlantic filed its complaint.[3]  The five month period between

_____

[3].     According to the Hansens, at the beginning of 1991, HBI

moved its headquarters from Pennsylvania to New Jersey.  In an

affidavit submitted to the district court in connection with the

Hansens' motion to dismiss, Jere A. Young, the Chairperson of the

Board and Chief Executive Officer of HBI, alleged the following

facts:  in early 1991, HBI transferred all of its books and

records, including all accounting and financial records, to New

Jersey; also in early 1991, all employees of HBI were either

terminated or transferred to executive positions with HBI's New

Jersey subsidiary, Hansen Savings Bank, SLA, or to Hansen Savings

Bank's Pennsylvania subsidiary; from the beginning of 1991, the

office of HBI's Chief Executive Officer was located in New

Jersey; and, finally, from early 1991, "substantially all of the

accounting, financial, corporate and legal activities of HBI were

conducted from HBI's headquarters in Hammonton, New Jersey."

(Defendants/Appellants' Appendix ("Da.") at 25).

the time when HBI ceased to conduct business activities and the time Midlantic filed its complaint did not, the Hansens argue, dissipate HBI's local character for diversity purposes. HBI's principal place of business for diversity purposes, according to the Hansens, was HBI's last principal place of business, that is, New Jersey.

In addressing the jurisdictional question in this case, we must resolve the issue of HBI's citizenship under 28 U.S.C. § 1332(c), bearing in mind that HBI was an inactive corporation at the time the complaint was filed.[4] The issue of the citizenship under Section 1332(c) of an inactive corporation is one of first impression in this circuit. Essentially, the question before us is whether an inactive corporation can be deemed to have a "principal place of business" at all.

We gave meaning to the phrase "principal place of business" in Kelly v. United States Steel Corp., 284 F.2d 850 (3d Cir. 1960), concluding that "corporate activities" determine the corporation's principal place of business. Kelly, 284 F.2d at 854. Inasmuch as we consider the actual business activities of the corporation to be determinative of the corporation's principal place of business, we conclude that as a general matter, an "inactive" corporation (that is, a corporation conducting no business activities) has no principal place of

---

[4]. By "inactive" corporation, we mean a corporation that has ceased any and all business activities. In the Young Affidavit, it is admitted that "[s]ince January 10, 1992, . . . HBI has had no active subsidiary company and no business activities." (Da. at 26-27).

business, and is instead a citizen of its state of incorporation only.

We thus further conclude that HBI, which was inactive at the time Midlantic filed its complaint, had no principal place of business under Section 1332 when this suit was commenced. When this lawsuit was commenced, HBI was a citizen of its state of incorporation only, namely, Delaware. We therefore find that complete diversity is present in this case.

We acknowledge that the conclusion we reach today with regard to the citizenship of an inactive corporation conflicts with that reached by the Courts of Appeals for the Second and Fifth Circuits, the only two of our sister courts of appeals to have addressed the matter.

The Second Circuit opined that when a corporation ceases business activity, it is to be deemed a citizen both of its state of incorporation and of the state in which "it last transacted business . . . ." Wm. Passalacqua Builders v. Resnick Developers, 933 F.2d 131, 141 (2d Cir. 1991). In so holding the Second Circuit placed principal reliance upon notions of congressional intent:

> To allow inactive corporations to avoid
> inquiry into where they were last active
> would give them a benefit Congress never
> planned for them, since under such a rule a
> defunct corporation, no matter how local in
> character, could remove the case to federal
> court based on its state of incorporation.

Wm. Passalacqua Builders, 933 F.2d at 141.[5]

---

[5] The Second Circuit also relied upon the fact that it had previously rejected the argument of a bankrupt that the district

The Fifth Circuit adopted a more flexible approach, holding that while the place of an inactive corporation's last business activity is relevant to the inquiry into the inactive corporation's principal place of business, it is not dispositive of the inquiry.  Harris v. Black Clawson Co., 961 F.2d 547, 551 (5th Cir. 1992).  Instead, the court suggested, the amount of time elapsed between the date when the corporation ceased business activities and the date of the suit should assist in determining the relevance of the situs of the corporation's now-ceased business activities to the determination of the

(..continued)
court lacked jurisdiction because New York was not a place of business at least six months preceding the filing of the bankruptcy petition.  Id. (citing Fada of New York, Inc. v. Organization Serv. Co., 125 F.2d 120 (2d Cir. 1942) (per curiam).
"Because New York had been a principal place of business, we ruled[,]" the Wm. Passalacqua court observed, "that the bankruptcy petition had been properly filed in New York."  Id.

> Fada is particularly instructive because the
> bankruptcy laws in effect at that time provided for
> jurisdiction either in the place of the corporation's
> domicile or in its principal place of business, and
> Congress amended § 1332(c) to follow these provisions
> in the bankruptcy laws.

Wm. Passalacqua Builders, 933 F.2d at 141 (citations omitted); but see Moore's Federal Practice ¶ 0.77[3.-1], 104 ("In the legislative history to the 1958 statute which injected the "principal place of business" criterion into the diversity statute, Congress specifically instructed courts to look to bankruptcy precedent for guidance in interpreting the phrase. Ample bankruptcy precedent existed, but consistent bankruptcy precedent did not.  Although the courts originally followed bankruptcy precedent -- conflicts and all -- the ensuing three decades have witnessed a significant emergence of general principles and criteria for making the jurisdictional determination.").

corporation's principal place of business. But where the corporation has been inactive in a state for "a substantial period of time, in this case five years,"[6] the Harris court continued, that state, as a matter of law, is not the corporation's principal place of business. Harris, 961 F.2d at 551.

Our conclusion is also in conflict with that of several of the district courts to have considered the citizenship of an inactive corporation. Most of the district courts to address the issue have found an inactive corporation to be the citizen both of its state of incorporation and of its last principal place of business. See Comtec, Inc. v. National Technical Schools, 711 F. Supp. 522, 525 (D. Ariz. 1989); China Basin Properties v. Allendale Mut. Ins., 818 F. Supp. 1301, 1305 (N.D. Cal. 1992); China Basin Properties v. One Pass, Inc., 812 F. Supp. 1038, 1040 (N.D. Cal. 1993.) As principal support for their position, these district courts proffer a plain meaning argument.

> [W]hen Congress amended section 1332 to include a corporation's principal place of business as its state of incorporation through the use of the conjunctive "and," Congress could not have meant that a corporation's citizenship would be its principal place of business or its state of incorporation. If Congress intended such a result, it clearly could have expressly stated as such. Since there is nothing in section 1332 to suggest that a corporation's principal place of business should be ignored once that corporation becomes inactive, a

---

[6]. The question of the substantiality of the duration of inactivity, the court explained, must be determined on a case by case basis. Id. at 551 n.10.

> strict reading of the statute requires this
> Court to utilize [the] last principal place
> of business in determining . . . [corporate]
> citizenship.

China Basin Properties, 818 F. Supp. at 1304-05; see also Comtec, 711 F. Supp. at 524 ("Section 1332(c) states that corporate diversity is based on both the place of incorporation and principal place of business.  By using the conjunction `and,' Congress intended for all of the requirements of the statute to be fulfilled.").

We believe the interpretation of Section 1332(c) that we adopt today most closely comports with the plain meaning of the statute.  We do not find persuasive the argument that Congress' use in 1332(c) of the conjunction "and" signifies that Congress intended that the courts strain to locate a principal place of business when no such place in reality exists.  We reject the notion that implicit in the statute's terms is the requirement that all corporations be deemed to have a principal place of business.  Far more significant to a plain meaning analysis, and thus far more indicative of congressional intent, is the fact that in Section 1332 Congress provided that a corporation is to be deemed a citizen of the state in which it has its principal place of business.  Congress could easily have provided that a corporation shall be deemed a citizen of the state in which it "has or has had" its principal place of business.  Clearly, however, Congress has provided no such thing.

We are mindful of the concern expressed in Wm. Passalacqua Builders and in several district court opinions, that

the conclusion we reach today may, in certain cases, result in the subversion of the intent of Congress in amending Section 1332.[7]  We believe, however, that the benefits of certainty and clarity which obtain from the "bright line" approach we adopt outweigh the potential for the harm identified by the Second Circuit.

                                    III.

        We next address the timeliness of the Hansens' notice of appeal.  We find United States v. Schaefer Brewing Co., 356 U.S. 227 (1958), to be dispositive.  Indeed, this case mirrors Schaefer Brewing Co. in two significant respects:  first, as was the case in Schaefer Brewing Co., the case before us is one for the recovery of money only; second, as was the case in Schaefer Brewing Co., the district court's opinion and accompanying order granting summary judgment did not expressly or by reference specify the exact amounts Midlantic was entitled to recover thereon.

> While . . . there is no statute or rule that
> specifies the essential elements of a final
> judgment, and this Court has held that "[n]o
> form of words and no peculiar formal act is
> necessary to evince [the] rendition [of a
> judgment]," yet it is obvious that a final
> judgment for money must, at least, determine,
> or specify the means for determining, the
> amount; and an opinion, in such a case, which
> does not either expressly or by reference
> determine the amount of money awarded reveals

---

[7].    It has been observed that through the principal place of business provision, "Congress purported to preclude what was in fact a local entity from suing (or being sued by) a local citizen in federal court simply because it was chartered in another state."  Moore's Federal Practice ¶ 0.77[3.-4].

> doubt, at the very least, whether the opinion
> was a "*complete* act of adjudication" . . . or
> was intended by the judge to be his [or her]
> final act in the case.

Schaefer Brewing Co., 356 U.S. at 233-34 (citations omitted) (emphasis in original).

Because the district court's January 7 opinion and order did not determine the exact amount of money Midlantic was entitled to receive pursuant to the issuance of summary judgment in its favor, we have little difficulty concluding that it neither embodies the essential elements of a judgment for money nor demonstrates the district court's intention that it constitute its final acts in this case. See Mauriello v. Univ. of Med. & Dentistry of N.J., 781 F.2d 46, 49 (3d Cir. 1986) (quoting Schaefer Brewing Co. for the proposition that to be final, a judgment for money must, at least, determine, or specify the means of determining, the amount of money awarded). We conclude that the district court's January 7 order does not constitute a "judgment" or "order" within the terms of Fed. R. App. P. 4(a), and that it is instead the district court's January 27 "Final Judgment" which constituted its final act in this case. We therefore hold that the Hansens' February 25 notice of appeal was timely filed because it was filed within 30 days after the date of entry of the judgment or order appealed from.

## IV.

Having determined that the district court had, and we have, jurisdiction over this case, we move to the remaining issue

on appeal: whether the district court erred in granting summary judgment in favor of Midlantic.

The Hansens appeal the grant of summary judgment against them in light of their affirmative defense that Midlantic violated the Equal Credit Opportunity Act, 15 U.S.C. § 1691 (the "ECOA") and Regulation B, 12 C.F.R. §§ 202.1 et seq. The Hansens claim that the existence of this affirmative defense raises a genuine issue of material fact which precluded the granting of summary judgment against them.

The district court rejected the Hansens' ECOA defense, finding that Mrs. Hansen was a bona fide joint applicant for the Midlantic loans.[8] We agree with the district court's assessment of Mrs. Hansen's status and will affirm the district court's rejection of the Hansens' ECOA defense.[9]

---

[8]. The district court, as an initial matter, noted that a substantial argument can be made that a violation of the ECOA cannot be interposed as an affirmative defense, but must instead be pleaded as a counterclaim. In fact, the courts are split on the question whether the ECOA may be used as an affirmative defense or may be asserted as a counterclaim only. Compare American Security Midlantic v. York, 1992 WL 237375 (D. D.C. Sept. 1, 1992); FDIC v. Notis, 602 A.2d 1164 (Me. 1992) and In re Remington, 19 B.R. 718 (Bankr. D.Co. 1982), with Riggs Nat. Bank of Washington, D.C. v. Linch, 829 F. Supp 163 (E.D. Va. 1993); CMF Virginia Land, L.P. v. Brinson, 806 F. Supp. 90 (E.D. Va. 1992) and United States v. Joseph Hirsch Sportswear Co. Inc., 1989 WL 20604 (E.D. N.Y. Feb. 28, 1989). We do not address this issue because of our disposition of the Hansens' ECOA claim on other grounds.

[9]. The Hansens also claim that the district court erred in not allowing them to continue discovery in connection with their ECOA affirmative defense. However, this claim is of no moment because, as we discuss infra, we agree with the district court that Mrs. Hansen was a joint applicant.

Our review of a district court's entry of summary judgment is plenary.  Public Interest Research of NJ v. Powell Duffryn Terminals, Inc., 913 F.2d 64 (3d Cir. 1990).  In reviewing the entry of summary judgment, we take the non-movant's allegations as true and draw all inferences in favor of the non-movant.  Berner Int'l Corp. v. Mars Sales Co., 987 F.2d 975 (3d Cir. 1993).

The ECOA was enacted to protect consumers from discrimination by financial institutions.  See United States v. Am. Future Sys., Inc., 743 F.2d 169, 174 (3d Cir. 1984).  In particular, the ECOA provides that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of . . . marital status."  15 U.S.C. § 1691(a)(1).  To further protect consumers, Regulation B, promulgated by the Federal Reserve Board pursuant to the ECOA, provides that "a creditor shall not require the signature of an applicant's spouse or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness for the amount and terms of the credit requested."  12 C.F.R. § 202.7(d)(1) (1992) (emphasis supplied).  A "joint applicant" is "someone who applies contemporaneously with the applicant for shared or joint credit" and not someone "whose signature is required by the creditor as a condition for granting the credit requested."  Official Staff Interpretation to § 202.7(d)(1).

The Hansens claim that Mr. Hansen was the "only true applicant" for the Midlantic loans and that Midlantic therefore

violated the ECOA when it required Mrs. Hansen to co-sign the loan applications. The district court disagreed with the Hansens' ECOA argument, finding, as a matter of fact, that:

> Mrs. Hansen was a co-owner of HBI, the holding company that acquired the Florida and New Jersey banks and whose stock was pledged to secure acquisition financing. The Hansens submitted consolidated statements of income and net worth for their loan application and included an explanatory note which detailed the joint ownership of their assets. Finally, and perhaps most importantly, G. Eileen Hansen and Elmer F. Hansen, Jr. are both parties to the Acquisition Agreement for Raritan Savings Bank, the first bank acquired through Midlantic financing. While Mrs. Hansen may not have had a major role in the day-to-day operations of HBI or any of its subsidiary banks, she clearly had an equal stake with Mr. Hansen in the assets which secured Defendants' borrowing. Under these circumstances, Mrs. Hansen was a bona fide joint applicant for the loans and the ECOA does not protect her from liability upon plaintiff's claims in this suit.

(D.Ct. op. January 6, 1993 at 10; Pa. at 538).

The district court observed that this case differed from other cases in which violations of the ECOA or Regulation B were found to have occurred. In those cases, the district court noted, the spouses who were required to sign the notes were not connected to the underlying transactions for which the loans were sought. See, e.g., Marine American State Bank v. Lincoln, 433 N.W.2d 709, 711 (Iowa 1988) (wives of applicants neither officers nor shareholders in business and had no material participation in its activities); American Security Bank v. York, 1992 WL 237375 (D. D.C. Sept. 1, 1992) (applicants applied for loan for their

business; wives had no ownership interest in business and played no role in loan negotiations).

We agree with the district court that Mrs. Hansen was a "joint applicant." Though the Hansens claim that Mr. Hansen sought the loans alone, several of the loans were for the purchase and financing of Raritan, of which the Hansens were joint purchasers. All of the assets listed on the statement of net worth supplied to Midlantic for the loan to purchase Raritan were jointly owned. The list of loans the Hansens applied for and the affidavit of Barbara Parker, the Midlantic employee who served as account officer for Raritan, indicate that the Hansens jointly purchased Raritan and that Midlantic relied on documents setting forth jointly owned properties in granting the loan (Da. at 195). In addition, there were loans for the Florida and New Jersey thrifts, subsidiaries of HBI, of which the Hansens were the joint owners. Furthermore, contrary to the Hansens' assertion that Mrs. Hansen had nothing to do with the business, the statement of net worth stated, "E.F. Jr. and G. Eileen Hansen, his wife, operate their business, Hansen Properties ("Hansen") as a sole proprietorship." (Pa. at 486). Finally, even though there were no properties pledged that were solely owned by Mrs. Hansen (indeed she had no income and no substantial assets of her own (Hansen affidavit, Pa. at 391)), all properties pledged were jointly owned. These facts constitute powerful evidence that the Midlantic loans were jointly applied for and were secured by jointly owned assets and compel the conclusion that Mrs. Hansen, at the very least, was a *de facto* joint

applicant for the loans in question.  See Riggs National Bank of Washington, D.C. v. Webster, 832 F. Supp. 147, 151 (D. Md. 1993) (wife of individual loan applicant held to be a *de facto* joint applicant where loan was for refinancing and renovation of a building owned by her and financial statement submitted by applicant included both jointly owned properties and properties she solely owned).

V.

Having determined that we have, and the district court had, jurisdiction over this case, and for the above-stated

reasons, we will affirm the district court's entry of summary judgment in favor of Midlantic and against the Hansens and HBI.

Midlantic National Bank v. E. F. Hansen, Jr.;
G. Eileen Hansen; Hansen Bancorp, Inc.
Nos. 93-5120 & 93-5160

SEITZ, Circuit Judge, dubitante.

I agree with the majority that our court has appellate jurisdiction of these appeals.  However, I have serious doubt as to the standard that should be adopted by our court to determine the citizenship of an inactive corporation for diversity jurisdiction purposes.

The diversity statute, which confers jurisdiction on federal courts in certain circumstances, is of considerable age. Its principal purpose is to provide a federal forum where out of state citizens, including corporations, could presumably avoid the prejudices of local courts and juries.

Before 1958, a corporation was deemed a citizen of the state in which it was incorporated for purposes of diversity.  In the 1950s, Congress became concerned with the ease with which corporations removed essentially "local" cases to the federal courts based solely on their place of incorporation.[10]  In 1958, Congress amended the diversity statute to provide that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State in which it has its principal place of business." 28 U.S.C. § 1332(c) (amended

---

[10]. The legislative history to the 1958 amendment of section 1332(c) centered around the perceived evil of allowing an essentially local corporation to remove a case to the federal court simply because the corporate charter was obtained in another state. See S. REP. No. 1830, 85th Cong., 2d Sess. 2 (1958), reprinted in 1958 U.S.C.C.A.N. 3099, 3102.

portion emphasized).  However, neither the amendment itself nor the legislative history to section 1332(c) refers to the citizenship of an inactive corporation.

The general view in the federal courts that have addressed the present issue is that an inactive corporation is a citizen of both the state where it is incorporated and the state where it had its last principal place of business. See, e.g., Harris v. Black Clawson Co., 961 F.2d 547 (5th Cir. 1992); Wm. Passalacqua Builders, Inc. v. Resnick Developers South Inc., 933 F.2d 131 (2d Cir. 1991).[11]  This rule seems to embrace Congress' intent to deny a federal forum to "local" corporations in actions involving local citizens.

On the other hand, the majority's bright line test certainly has simplicity to recommend it, and it may reflect the reality that an inactive corporation has no business activities, let alone a principal place of business.  However, the rule seems to run counter to the congressional purpose underlying the 1958 amendment to the diversity statute.

The issue here is one that Congress should address. After weighing the conflicting considerations, I remain doubtful as to the proper application of section 1332(c).  In view of my

---

[11].    In Harris, the Fifth Circuit adopting a more flexible approach, stated, "[A]s a matter of law, where a corporation has been inactive in a state for a substantial period of time, in this case five years, that state is not the corporation's principal place of business." Harris, 961 F.2d at 551 (footnote omitted).  The court added that the question of substantiality must be determined case-by-case. Id. at 551 n.10.

doubt, it would serve no purpose for me to address the other issues in the case.