

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-26-1998

# Mennen Company v. Atl Mutl Ins Co

Precedential or Non-Precedential:

Docket 97-5266

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Mennen Company v. Atl Mutl Ins Co" (1998). *1998 Decisions.* Paper 146.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/146

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 26, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 97-5266

THE MENNEN COMPANY
Appellant,

v.

ATLANTIC MUTUAL INSURANCE COMPANY
CENTENNIAL INSURANCE COMPANY
AETNA CASUALTY & SURETY COMPANY
FEDERAL INSURANCE COMPANY

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
D.C. CIVIL NO. 93-5273

ARGUED November 20, 1997

BEFORE: SCIRICA AND LEWIS,* Circuit Judges,
and POLLAK,** District Judge.

(Filed June 26, 1998)

_____

* Judge Lewis heard argument in this matter but was not available to
clear the opinion.

** Honorable Louis H. Pollak, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

Gita F. Rothschild (Argued)
McCarter & English
100 Mulberry Street
Four Gateway Center
Newark, New Jersey 07101

 Attorney for Appellant

Kevin E. Wolff
McElroy, Deutsch & Mulvaney
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962

Attorney for Appellees,
Atlantic Mutual Insurance
 Company
Centennial Insurance Company

Peter E. Mueller
Harwood Lloyd
130 Main Street
Hackensack, New Jersey 07601

 Attorney for Aetna Casualty
 and Surety Company

John J. Gibbons (Argued)
Crummy, Del Deo, Dolan, Griffinger
 & Vecchione
One Riverfront Plaza
Newark, New Jersey 07102

David L. Menzell
Cuyler, Burk & Matthews
Four Century Drive
Parsippany, New Jersey 07054

 Attorneys for Federal
 Insurance Company

OPINION OF THE COURT

POLLAK, District Judge.

Mennen, Inc. appeals the district court's dismissal, for
lack of subject matter jurisdiction, of its complaint against
Federal Insurance Company. For the reasons set forth
below, we affirm.

I.

This litigation commenced in 1993 when Mennen, a New
Jersey corporation, brought suit in the District Court for
the District of New Jersey against several of its insurers--
all of them incorporated and having their principal places of
business outside of New Jersey--seeking indemnity under
state law for environmental clean-up liabilities. Mennen's
complaint based federal jurisdiction on the diversity
statute. 28 U.S.C. S 1332. Mennen did not initially name
appellee Federal Insurance Co. ("Federal") as a defendant
because Mennen believed that Federal--a company
incorporated in Indiana--had its principal place of business
in New Jersey, thus precluding diversity jurisdiction.
Moreover, when Mennen filed suit, New Jersey insurance
law was governed by a joint and several liability regime--a
regime which appeared to permit Mennen to seek full
recovery from its other insurers without suing Federal.
While the suit was pending, however, the New Jersey
Supreme Court decided Owens-Illinois v. United Insurance
Co., 138 N.J. 437 (1994), which eliminated joint and several
liability in cases involving several insurers and substituted
a pro rata contribution scheme. The practical effect of the
Owens-Illinois decision with respect to this litigation was
that, if Mennen was to have the complete recovery it
sought, it would be necessary for Mennen to secure the
joinder of Federal as a party defendant.

Mennen's first step was to move to compel the defendants
to implead Federal. But this stratagem proved
unsuccessful; the motion was denied. Then Mennen
discovered pleadings that Federal had filed in other actions

3

--pleadings in which Federal stated that its principal place of business was in Indiana, its state of incorporation. Armed with this new understanding of Federal's business operations, Mennen filed an amended complaint joining Federal as a defendant. Federal responded by moving that it be dismissed as a defendant for lack of subject matter jurisdiction. Federal contended that its principal place of business was in New Jersey, and hence that, for the purposes of diversity jurisdiction, it was a citizen of New Jersey as well as of Indiana; this meant, so Federal argued, that there was a New Jersey plaintiff (Mennen) and a New Jersey defendant (Federal), a configuration fatal to diversity jurisdiction. Mennen opposed the motion to dismiss, arguing that Federal was a citizen of Indiana only. [1] The district court, concluding that Federal's principal place of business was indeed New Jersey, granted Federal's motion. This appeal followed.

II.

The facts bearing on jurisdiction are undisputed. Federal is a corporation wholly owned by the Chubb Corporation. For the first approximately ninety years of its existence, Federal was incorporated in New Jersey. Since 1990, however, Federal has been incorporated in Indiana. The corporation has an office in Indiana designated as its "Statutory Home Office" in fulfillment of a requirement of Indiana law.

Federal is in the business of providing property and casualty insurance in the United States and abroad. Although a great deal of the company's activity is carried on domestically, Federal itself has no employees in the United States.[2] Rather, Federal's business in the United States is conducted by employees of Chubb & Son, another wholly-owned subsidiary of the Chubb Corporation, under a management services contract. Pursuant to similar

_____

1. Mennen also filed a motion for sanctions against Federal on the basis of these inconsistent pleadings, a motion the district court denied. Mennen has not appealed this ruling.

2. Federal does have some employees, but it appears that all of them work in Asia.

4

arrangements, many of these employees also handle the business of other Chubb Corporation affiliates.

In New Jersey, some two thousand Chubb & Son employees conduct Federal's business. Specifically, Federal's national underwriting and claims-handling functions are administered by Chubb & Son personnel at an office complex in Warren, New Jersey. As the district court found and the record reflects, the Warren office also (1) houses Federal's accounting, treasury, marketing, investment, human resources, and loss-control departments; (2) is the location of the majority of Federal's "senior executives;"[3] and (3) is the situs for the filing of Federal's tax returns, policy forms, and annual reports.

In Indiana, forty-five Chubb & Son employees carry out Federal's business. As Indiana law requires of companies incorporated in the state, Federal's primary books and records are maintained at the Indiana office. However, the Indiana office functions largely as a local claims and underwriting office, similar to other such local offices throughout the country; no national corporate-wide authority over such functions is exercised in Indiana.

Mennen does not undertake to challenge the district court's factual findings. Rather, Mennen argues that—given that Federal has no employees in New Jersey—Federal is only a citizen of Indiana, its state of incorporation, and that the district court therefore erred in concluding that subject matter jurisdiction is absent. We exercise plenary review over this issue. Mellon Bank v. Farino, 960 F.2d 1217, 1220 (3d Cir. 1992).

---

3. While the record is not entirely clear as to which officers the term "senior executives" encompasses, it appears likely that the term refers to Federal's elected officers—the president and board chair, senior vice presidents, and vice presidents. Of Federal's appointed officers—assistant vice presidents, assistant secretaries, and assistant treasurers—a plurality are located in New Jersey. Only one appointed officer is located in Indiana. The remainder are assigned to other cities in the United States or to Federal's "Asia Pacific Zonal Office." None of the officers within the United States is an employee of Federal.

III.

A.

Section 1332(a)(1) of the diversity statute requires complete diversity between the parties--that is, jurisdiction is lacking if any plaintiff and any defendant are citizens of the same state. Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806). The determination of a corporation's citizenship was a matter of some doubt until Congress in 1958 amended 28 U.S.C. S 1332 by adding a sub-section (c)(1), which provided, in relevant part, that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."4 Act of July 25, 1958, Pub. L. No. 85-554, 72 Stat. 415 (codified at 28 U.S.C. S 1332(c)(1)).

_____

4. Diversity jurisdiction was statutorily authorized by Section 11 of the Judiciary Act of 1789, 1 Stat. 79, but the statute was silent on the subject of corporations. Initially, the Supreme Court, reasoning that a corporation could not itself be a citizen, held that whether a corporation could sue in diversity depended on the citizenship"of the individuals who compose the corporation." Bank of United States v. Deveaux, 9 U.S. (5 Cranch) 61, 92 (1809). Deveaux had the effect of markedly restraining the use of diversity jurisdiction in litigation involving corporations. "As a result of the decision, the reports of the Supreme Court and the Circuit Courts during the forty years thereafter reveal an almost complete absence of cases in which corporations (other than banking and insurance) were litigants . . . ." 1 Charles Warren, The Supreme Court in United States History 390-91 (1926); see also Richard H. Fallon, Daniel J. Meltzer, & Richard L. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 1535 (4th ed. 1996). Thirty-five years after Deveaux the Court changed course in Louisville, Cincinnati & Charlestown R.R. Co. v. Letson, 43 U.S. (2 How.) 497, 558 (1844), in which it held that a corporation "is entitled . . . to be deemed" a citizen of the state that created it. A decade later, in Marshall v. Baltimore & Ohio R. Co., 57 U.S. (16 How.) 314, 328 (1854), the Court arrived at the Letson result but through different reasoning. In an apparent effort to reconcile Deveaux and Letson, the Marshall Court held that although a corporation cannot be a citizen, the persons who make up the corporation "may be justly presumed to be resident in the State which is the necessary habitat of the corporation, and where alone they can be made subject to suit; and should be estopped in equity from averring a different domicil." 57 U.S. (16 How.) at 328; see also Ohio & Mississippi

One of Congress's main purposes in enacting S 1332(c)(1) was to curtail the availability of diversity jurisdiction. See S. Rep. No. 1830, 85th Cong., 2d Sess. (1958), reprinted in 1958 U.S.C.C.A.N. 3099, 3101 ("In adopting this legislation, the committee feels . . . that it will ease the workload of our Federal courts by reducing the number of cases involving corporations which come into Federal district courts on the fictional premise that a diversity of citizenship exists.").

Mennen is a citizen of New Jersey. Federal, incorporated in Indiana, was determined by the district court to have its principal place of business in New Jersey, making Federal a citizen of New Jersey as well. The district court thus found complete diversity lacking and dismissed the complaint with respect to Federal. Consequently, this appeal turns on whether the district court erred as a matter of law in concluding that Federal's principal place of business is in New Jersey.

B.

In this circuit, the key authority interpretingS 1332(c)(1) is Kelly v. United States Steel Corp., 284 F.2d 850 (3d Cir. 1960). The Kelly articulation of standards for determining a company's principal place of business has come to be known as the "center of corporate activities" test for corporate citizenship. See generally 13B Charles Alan

_____

R. R. v. Wheeler, 66 (1 Black) U.S. 286, 296 (1862) (explicating Marshall).
Whether the Letson view or that expressed in Marshall doctrinally carried the day until the amendment of the diversity statute in 1958 remains a matter of historical debate. Compare Navarro Sav. Ass'n v. Lee, 446 U.S. 458, 461 n.7 (1980)("[Marshall] view endured until 1958"), and United Steelworkers of America, AFL–CIO v. R. H. Bouligny, Inc., 382 U.S. 145, 148 (1965) (characterizing the Marshall formulation as a "compromise destined to endure for over a century"), with Carden v. Arkoma Associates, 494 U.S. 185, 194 n.3 (1990)(" Marshall's fictional approach appears to have been abandoned. Later cases revert to the formulation of [Letson] that the corporation has its own citizenship.")(citing Great Southern Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 456 (1900), and Chapman v. Barney, 129 U.S. 677, 682 (1889)). See also National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 618 n.12 (1949)(Rutledge, J. concurring in the judgment).

Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure S 3625 (2d. ed. 1984 & Supp. 1998)(hereinafter "Federal Practice and Procedure"). The Kelly inquiry, reaffirmed and refined in subsequent cases, requires courts to ascertain "the headquarters of day-to-day corporate activity and management." 284 F.2d at 854; see also Midlantic Nat. Bank v. Hansen, 48 F.3d 693, 696 (3d Cir. 1995); Quaker State Dyeing and Finishing Corp. v. ITT, 461 F.2d 1140, 1143 (3d Cir. 1972).

In Kelly, this court was called on to determine the principal place of business of the "giant" (284 F.2d at 854) United States Steel Corporation, which approximately forty years ago had fourteen divisions and eleven subsidiaries and whose "various manufacturing activities spread over practically all the United States and extend[ed] to foreign countries." Id. at 853. The plaintiffs in Kelly--seeking to overturn dismissals for lack of diversity jurisdiction--had urged a " `nerve center' " approach, according to which the locus of the board of directors' final decision-making authority would be determinative of the defendant corporation's principal place of business. Speaking through Judge Goodrich, the court characterized plaintiffs' proposed test as "a pleasant and alluring figure of speech," but then turned "to a consideration of the facts of the Steel Corporation's life." Id. Applying that pragmatic approach, the court noted that final authority over "corporate policy, including its financing," rested with the board in New York, but that the board had delegated "the duty of conducting the business of the corporation relating to manufacturing, mining, transportation and general operation" to an "Operation Policy Committee," consisting of the board chairman, the president, the seven executive vice presidents and certain other principal officers,"which sits and conducts its affairs" in Pennsylvania. Id. at 854. Further, the court pointed out that the seven executive vice presidents, sixteen of the seventeen administrative vice presidents, and twenty-two of the twenty-five vice presidents had their offices and staffs in Pennsylvania. Consequently, the court identified Pennsylvania as the state in which the corporation's "business by way of activities is centered." Id.

The Kelly court also looked to factors such as "physical location of employer's plants and the like"--factors which, while of "lesser importance," were of "some significance" when "added to the items already enumerated pointing to the center of corporate activity." Id. Specifically, the court noted that Pennsylvania had approximately a third of the company's personnel, tangible property, and productive capacity--far more than New York and, apparently, more than any other state. Id.

In the present case, all of the Kelly factors--both the primary considerations and what in Quaker State Dyeing and Finishing Corp. v. ITT, 461 F.2d 1140, 1143 (3d Cir. 1972), we referred to as the "secondary considerations"--point to New Jersey. As between New Jersey and Indiana the choice is clear: the critical mass of corporate functions is located in the Warren offices. Warren is not only the center of Federal's national underwriting operations but also the location of its accounting, legal, human resource, and loss-control activities. There are more than two thousand Chubb & Son employees carrying out Federal's business--underwriting and providing insurance--in the Warren complex, where most of the company's officers are located. By contrast, forty-five Chubb & Son employees conduct Federal's business in the Indiana office, an office that has no corporation-wide authority.

Hence a straightforward application of Kelly's principles leads to the conclusion that Federal's principal place of business is in New Jersey. Mennen, however, argues that this court's recent decision in Midlantic Nat. Bank v. Hansen, 48 F.3d 693 (3d Cir. 1995), has effected a sea-change in the principal-place-of-business inquiry in this circuit. Hansen dealt with the problem presented when a court is called upon to decide, for diversity purposes, the citizenship of a corporation which has become entirely inactive. In Hansen, the corporation in question--Midlantic National Bank--was a failed savings and loan. The Resolution Trust Corporation had seized Midlantic and prohibited it from conducting any further business. We concluded that in a situation of this sort it was not necessary to "strain to locate a principal place of business when no such place in reality exists." Id. at 696. Given that

9

the Kelly inquiry looks to actual business activities, we held in Hansen that a corporation not engaged in business activities can only be considered a citizen of its state of incorporation. Id. Hence our approach in Hansen does not represent a departure from this court's Kelly analysis, as Mennen's argument suggests, but a consistent application of Kelly's underlying premises.[5]

Mennen acknowledges that Federal is not an inactive corporation but urges that we extend the logic of Hansen to this case. Stressing our statement that courts should not "strain to locate a principal place of business," Mennen argues that Hansen should apply here because of the unusual relationship between Mennen and Chubb & Son. Since Federal itself has no employees in the United States, but rather contracts out all of its underwriting and claims-handling functions to an affiliate, Mennen urges that Federal be treated as the functional equivalent of an inactive corporation for jurisdictional purposes.

We decline Mennen's invitation to broaden the reach of our holding in Hansen. In adopting the "center of corporate activities" test in Kelly, this court opted for a functional approach to the principal place of business inquiry.[6] Rather

_____

5. As we noted in Hansen, other circuits have taken different views in determining the citizenship of inactive corporations. Compare Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 141 (2d Cir. 1991)(last principal place of business dispositive), with
Harris v. Black Clawson Co., 961 F.2d 547, 551 (5th Cir. 1992)(last principal place of business is relevant but not controlling). On the subject generally, see Timothy J. Yuncker, Inactive Corporations and Diversity Jurisdiction Under 28 U.S.C. S 1332(c): The Search for a Principal Place of Business, 28 U. Toledo L. Rev. 815 (1997); Dawn Levy, Note, Where Do Dead Corporations Live?: Determining the Citizenship of Inactive Corporations for Diversity Jurisdiction Purposes, 62 Brooklyn L. Rev. 663 (1996).

6. As previously noted, this court in Kelly considered the "center of corporate activities" test a sounder guide than the "nerve center" test contended for by the Kelly plaintiffs-appellants. The "nerve center" test derives from the decision in Scot Typewriter Co. v. Underwood Corp., 170 F.Supp. 862 (S.D.N.Y. 1959). The Scot Typewriter formulation placed emphasis on the highest levels of corporate decision making, looking to "the place where all of its business was under the supreme direction and

10

than looking to the location of the highest level of policy-making as dispositive, we looked to the location of production and "the headquarters of day-to-day corporate activity and management." 284 F.2d 854. In light of our stress on the pragmatic facts of corporate life as opposed to more formal lines of inquiry, we find it appropriate to consider the substantial quantity of Federal's activity carried out in New Jersey, notwithstanding that those who carry out Federal's business are not formally Federal employees. It is fully in line with this court's consistently functional approach to consider the actual day-to-day activities of Federal, irrespective of what corporation's name appears on the paychecks of the employees who carry out those activities.7 Accordingly, we reject Mennen's contention

_____

control of its officers." Id. at 865 (footnote and internal quotation marks
omitted). Courts and commentators have since noted that the two approaches are not necessarily antagonistic. See, e.g., Merino de Walker v. Pueblo Intern., Inc., 569 F.2d 1169, 1171 (1st Cir. 1978); Egan v. American Airlines, Inc., 324 F.2d 565, 566 (2d Cir. 1963); 13B Federal Practice and Procedure S 3625 (2d ed. 1984 & Supp. 1998). Several courts have more recently embraced a "total activities" test, which synthesizes the two approaches. See, e.g., Gafford v. General Elec. Co., 997 F.2d 150 (6th Cir. 1993); J.A. Olson Co. v. City of Winona, 818 F.2d 401, 406 (5th Cir. 1987); Vareka Invs., N.V. v. American Inv. Properties, Inc., 724 F.2d 907, 910 (11th Cir.), cert. denied, 469 U.S. 826 (1984). Whether and to what extent the "nerve center" test as it would be applied today differs in a meaningful way from the Kelly test is not a question that needs to be resolved in the case at bar. To the extent that the tests appear to differ, at least as a matter of emphasis, the outcome of this appeal would be the same under either approach.

7. Mennen also urges that the district court's conclusion impermissibly disregards the separate corporate identities of Federal and Chubb & Son. In aid of this argument, Mennen points to a plethora of cases holding that parents and subsidiaries each have their own principal places of business. This argument need not detain us long. The cases cited by Mennen are typified by Quaker State Dyeing and Finishing Corp. v. ITT, 461 F.2d 1140, 1143 (3d Cir. 1972), which held that "a subsidiary corporation which is incorporated as a separate entity from its parent corporation is considered to have its own principal place of business." (quoting 1 Moore's Federal Practice 717.10, S 0.77). As Federal points out,
this is indeed an "unremarkable proposition" and one that has no relevance in this case. Quaker State Dyeing simply instructs that a

11

that the district court erred in taking into account the
activities of Chubb & Son employees, who, pursuant to a
management services contract, carry out the practical work
of Federal.

Mennen also urges that we give weight to Federal's
assertions, in unrelated litigation, that its principal place of
business is in Indiana. Collecting an array of pleadings filed
by Federal in other proceedings in which Federal was a
party defendant, Mennen contends that these
representations provide valuable evidence indicating where
Federal's corporate representatives believe the corporation's
principal place of business to be.[8]

_____

subsidiary has its own principal place of business unless there is some
abuse of corporate form that would allow the court to look through the
juridical separation between the corporations and therefore regard the
parent's principal place of business as that of the subsidiary. The district
court in this case did not attribute Chubb & Son's principal place of
business to Federal; rather, it examined those activities of Federal (albeit
carried out by employees of the affiliated corporation), and determined
that Federal had its own principal place of business in New Jersey. Thus
the district court was not imputing one affiliate's principal place of
business to another. Rather, the district court attributed to Federal the
services that Chubb & Son operatives perform on behalf of Federal,
which, as we here hold, is proper in this instance.

8. Specifically, Mennen points to the following: (1) Campbell v. New
Jersey Mfrs. Ins. Co., No. L–233693, an insurance coverage action filed
in the New Jersey Superior Court in 1996. The plaintiff in Campbell,
responding to Federal's argument that the action was barred by the
entire controversy doctrine, urged that it was not possible to join Federal
in the earlier federal court proceeding because Federal's New Jersey
citizenship would have destroyed diversity. Federal's reply brief
maintained that the corporation's principal place of business was in
Indiana. Federal later submitted a correction (after the underlying
controversy had settled), indicating that this representation was in error
and that the company's principal place of business was in New Jersey.
(2) In Gencorp v. Adriatic Ins. Co., No. 95–2464, a 1995 case in the
Northern District of Ohio, Federal stated in its original answer that its
principal place of business was in Indiana. Federal subsequently moved
for leave to amend the answer, stating that the original answer
misidentified the company's principal place of business as being in
Indiana when it was in fact in New Jersey. (3) In Mercury Fin. Co. v.

12

We do not find that these prior Federal pleadings have evidentiary value for the purpose of assessing where Federal's principal place of business is located. The representations made in these pleadings run contrary to the empirical facts with which the jurisdictional inquiry is concerned. While pleadings that contain unwarranted assertions as to matters bearing on jurisdiction reflect no great credit on the attorneys who apparently drafted and filed them without sufficient inquiry, the pleadings themselves have no intrinsic capacity either to establish or disestablish jurisdiction; it is axiomatic that a party may not confer or defeat jurisdiction by mere pleading. See Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702(1982); Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365, 377 n.21 (1978). Rather, subject matter jurisdiction depends upon facts of record, and when any question arises as to the existence of jurisdiction a federal court is obligated to make an independent determination of those facts. See Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."); Mitchell v. Maurer, 293 U.S. 237, 244 (1939).9

_____

Aetna Cas. Co., 900 F. Supp. 390, 391 (M.D. Ala. 1995), the court (presumably on the representation of Federal's counsel) identified Indiana as the location of Federal's principal place of business. In both Gencorp and Mercury, whether Federal was a citizen of New Jersey as well as Indiana appears to have been immaterial; diversity would not have been defeated in either case if New Jersey had been considered Federal's principal place of business. Mennen also cites a number of other pleadings, which, although not free of ambiguity, present no stark inconsistency with Federal's argument in this action that its principal place of business is in New Jersey.

9. In its reply brief, Mennen makes an oblique suggestion that Federal may be held to its prior representations. Although Mennen avoids overt invocation of "estoppel"--the term of art that seems most aptly to describe its argument--Mennen appears in effect to be urging that Federal be bound to those jurisdictional contentions.

In support of this argument, Mennen relies upon DiFrischia v. New York Central Railroad, 279 F.2d 141 (3d Cir. 1960), in which this court, while acknowledging the general precept that jurisdiction may not be

13

(Text continued on page 16)

_____

bestowed or waived by action of parties, held that the defendant was bound to its representation as to federal jurisdiction, despite a factual lack of diversity. In DiFrischia, the defendant had stipulated to jurisdiction early in the litigation, but then moved to dismiss after the expiration of the relevant limitations period. On these extreme facts, this court determined that the district court had abused its discretion in dismissing the action, stating that "a defendant may not play fast and loose with the judicial machinery and deceive the courts." 279 F.2d at 144.

In the two decades that followed, the holding in DiFrischia failed to draw broad support. With one exception, every circuit court called upon to apply DiFrischia either distinguished or voiced disapproval of the decision. See, e.g., Sadat v. Mertes, 615 F.2d 1176, 1188 (7th Cir. 1980) (DiFrischia, is applicable, if at all, only on its "unusual facts"); Eisler v. Stritzler, 535 F.2d 148, 151 n.2 (1st Cir. 1976)(noting that DiFrischia is "plainly inconsistent with governing Supreme Court authorities"); Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974)(holding DiFrischia distinguishable even though defendant did not raise jurisdictional defect until adverse judgment was rendered); see also 13 Federal Practice and Procedure S 3522 at 50 (1st ed. 1975)("the significance of the case as a general precedent is dubious."). Nor was this reluctance to find occasion for applying the DiFrischia rule confined to circuits other than our own. See, e.g., Joyce v. United States, 474 F.2d 215, 218 n.1 (3d Cir. 1973); Stapleton v. $2,438,110, 454 F.2d 1210, 1218 (3d Cir. 1972); Ramsey v. Mellon Nat. Bank & Trust Co., 350 F.2d 874, 879 (3d Cir. 1965); see also Eisler, 535 F.2d at 152 ("We note that DiFrischia has not proved to be a particularly generative inroad on the traditional rule, even in the Third Circuit.").

The lone exception to this disinclination on the part of other circuit courts to follow DiFrischia was the Eighth Circuit in Kroger v. Owen Equipment & Erection Co., 558 F.2d 417 (8th Cir. 1977). That case presented the Eighth Circuit with facts similar to those that moved this court in DiFrischia to find an exception to the general rule against creating jurisdiction by estoppel. The jurisdictional issue in Kroger turned on the citizenship of Owen Equipment & Erection Co. ("Owen"), which was brought into the action under Rule 14 by the original defendant. Plaintiff later amended her complaint to state claims directly against Owen, and by the time of trial Owen was the only party defendant in the case. The amended complaint alleged that Owen was a Nebraska corporation with its principal place of business in Nebraska, an allegation Owen never directly disputed; rather Owen issued a general denial qualified by an admission that it was "'a corporation organized

and existing under the Laws of the State of Nebraska.' " 558 F.2d at 419. On the third day of trial, however, (well after the statute of limitations had run) Owen challenged jurisdiction, asserting that its principal place of business was in fact in Iowa, the state in which the plaintiff was domiciled. The district court rejected the challenge, and a divided panel of the Eighth Circuit affirmed, giving substantial weight to DiFrischia. 558 F.2d at 425-26 & nn.33-34.

DiFrischia's moment of recognition as a vital precedent was short-lived. The Supreme Court reversed the Eighth Circuit's Kroger decision in Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365 (1978), holding that a district court, in a diversity case, may not exercise ancillary jurisdiction over a state-law controversy between citizens of the same state. In doing so, the Court noted that "the asserted inequity in the respondent's alleged concealment of its citizenship is irrelevant. Federal judicial power does not depend upon `prior action or consent of the parties.' " Id. at 377 n.21 (quoting American Fire & Casualty Co. v. Finn, 341 U.S. 6, 17-18 (1951).

After over two decades of carefully stepping around DiFrischia, this court was presented, in Rubin v. Buckman, 727 F.2d 71 (3d Cir. 1984), with an occasion to revisit DiFrischia in light of the Supreme Court's decision in Owen Equipment. Rubin involved the kind of fact pattern that moved this court to the result in DiFrischia and the Eighth Circuit to its conclusion in Kroger. Rubin, alleging that he was a Hong Kong citizen, filed a diversity action against Buckman. However, after the district court granted Buckman's motion for summary judgment on the merits, Rubin filed a motion for reconsideration on the ground that there was no diversity; in that motion Rubin revealed that he was not in fact a citizen of Hong Kong. The district court--holding that DiFrischia was distinguishable--granted the motion, vacated its judgment, and dismissed the lawsuit. On appeal, Buckman urged that Rubin should have been bound to his jurisdictional allegation. Rejecting this argument, this court explicitly repudiated DiFrischia. The Rubin opinion emphasized that two intervening Supreme Court decisions--Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 n. 9 (1982), and Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365 (1978)--made it clear that "jurisdiction cannot be created by estoppel, even as a sanction for conduct such as that here or in DiFrischia." 727 F.2d at 72. Because of this inconsistency with Supreme Court precedent, the panel held that DiFrischia "can no longer be regarded as the law of this circuit." 727 F.2d at 72. One post-Rubin opinion of this court parenthetically mentions the holding in DiFrischia in a footnote, but the DiFrischia holding was not characterized by the court as being germane

15

Conclusion

For the foregoing reasons, the judgment of the district
court is affirmed.

_____

to any issue it was called upon to decide. Knop v. McMahan, 872 F.2d
1132, 1139 n.16 (3d Cir. 1989).

One might well think that our strong disavowal of the DiFrischia
holding in Rubin had put the matter to rest, at least as a live legal
issue
in this circuit. Mennen argues, however, that Rubin's report of
DiFrischia's demise was exaggerated. The Rubin panel, so Mennen urges,
was without power to overturn DiFrischia because Rule 9.1 of this court's
Internal Operating Procedures (IOP) provides that only an in banc
decision can overturn a prior panel's opinion.

To be sure, IOP 9.1 prohibits a panel of this court from overruling a
holding of a prior panel expressed in a published opinion. However, this
rule gives way when the prior panel's holding is in conflict with Supreme
Court precedent. See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46
F.3d 258, 266 n.6 (3d Cir. 1995). Judge Garth, in his Rubin
concurrence, wrote separately for the very purpose of emphasizing this
point. See Rubin, 727 F.2d at 74 (Garth, J., concurring)("Because the
rule in DiFrischia is obviously in conflict with Supreme Court precedent,
I agree that it should be overruled, and that our action in rejecting
DiFrischia may be accomplished without the necessity of an in banc
hearing.").

Mennen, however, struggles to save its argument by asserting that the
exception to this court's bar against intra-circuit conflicts applies only
when an intervening Supreme Court opinion calls for rejection of a prior
panel's holding. Mennen reasons that because Supreme Court cases
preceding DiFrischia consistently held that federal jurisdiction could not
be bestowed by consent or estoppel--and Owen Equipment is consistent
with Supreme Court decisions predating DiFrischia--our DiFrischia
opinion must be regarded as governing circuit law until the full court
overturns it. Neither logic nor our case law supports this position.

Supreme Court cases long predating DiFrischia  certainly made its
holding at least doubtful from the outset. See American Fire & Casualty
Co. v. Finn, 341 U.S. 6, 17-18 (1951); Mansfield, Coldwater & Lake
Michigan Ry. v. Swan, 111 U.S. 379 (1884). The Rubin court
acknowledged as much in its decision. 727 F.2d at 72 n.1. However, this
acknowledgment made DiFrischia a stronger candidate for overturning

16

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit
_____

without the need for rehearing by the full court, not a weaker one. We reject the proposition that a panel opinion which lacks harmony not only with subsequent Supreme Court authority but also with antecedent Supreme Court authority has a greater claim to permanence as circuit precedent than a panel decision undercut by subsequent Supreme Court authority but apparently not in tension with Supreme Court authority when announced.

It need hardly be added that our decisions interpreting the relevant IOP rule neither state nor imply the limiting principle for which Mennen contends. The very case that Mennen cites as supportive of its rather implausible reading of the rule--Goodman v. Lukens Steel Co., 777 F.2d 113, 120 (3d Cir. 1985)--approvingly quotes Judge Garth's concurrence in Rubin, which itself noted the tension between the DiFrischia holding and Supreme Court authority of both early and late vintage. See 727 F.2d at 74 (Garth, J., concurring). The fact that most cases in which we have applied the exception speak in terms of intervening decisions merely shows (what should be unsurprising) that it is the rare circuit court decision that is inconsistent with the weight of antecedent Supreme Court precedent.

With all charity, it should be observed that although the principle that jurisdiction cannot be waived or established by consent had been firmly established before DiFrischia was decided, the Supreme Court had yet to render a decision in a case presenting the rather extreme circumstances that this court confronted in DiFrischia. Hence reasonable minds could have concluded (and did conclude) that a party who had willfully concealed the absence of jurisdiction early in litigation would not be heard to assert the jurisdictional defect later in the proceedings. The advent of the Supreme Court's decision in Owen Equipment--which reversed the only circuit court opinion that embraced and applied the DiFrischia rule--certainly removed any lingering doubt on that score. Consequently, the Rubin panel's disavowal of DiFrischia can hardly be deemed to be outside of the panel's authority. Rather, the panel in Rubin did this court yeomanly service by laying to rest a rule that had already long been moribund. We will not undertake to revive it now.

17